# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 12, 2022

Lyle W. Cayce
Clerk

_____

No. 17-30610

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JASMINE PERRY,

*Defendant—Appellant*,

CONSOLIDATED WITH

_____

No. 17-30611

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

LEROY PRICE, ALONZO PETERS; CURTIS NEVILLE; SOLOMON DOYLE; DAMIAN BARNES; ASHTON PRICE; McCoy WALKER; TERRIOUES OWNEY; EVANS LEWIS,

*Defendants—Appellants*.

No. 17-30610
c/w No. 17-30611

---

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:15-CR-154-4; 2:15-CR-154-1;
2:15-CR-154-3; 2:15-CR-154-8; 2:15-CR-154-11;
2:15-CR-154-13; 2:15-CR-154-2; 2:15-CR-154-5;
2:15-CR-154-6 and 2:15-CR-154-7

---

Before JONES, HIGGINSON, and DUNCAN, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

This criminal appeal arises out of a nearly six-week long trial involving ten co-defendants, all of whom are now before this Court. Defendants Jasmine Perry, Leroy Price, Alonzo Peters, Curtis Neville, Solomon Doyle, Damian Barnes, Ashton Price, McCoy Walker, Terrioues Owney, and Evans Lewis appeal their convictions for numerous crimes related to their participation in the "39ers." We AFFIRM their convictions in part and VACATE in part.

## I. Factual Background

In April 2016, a federal grand jury returned a 47-count, superseding indictment against defendants, charging them with various crimes including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), drug[1] and gun conspiracies, violations of the Violent Crimes in Aid of Racketeering Act ("VICAR"), and firearms charges. The case proceeded to a jury trial that lasted 28 days. At trial, the Government sought to prove that each defendant was a member of the "39ers": a criminal gang made up of members from groups in New Orleans' Third and Ninth Wards. The two groups entered into an alliance of sorts, in order to sell drugs in both

---

[1] As relevant here, Defendants Perry, Owney, Lewis, and Doyle were not charged in the drug conspiracy because they had previously pleaded guilty to participating in a drug conspiracy in a separate case.

areas. The Government argued on appeal that the purpose of the 39ers was to sell drugs while protecting its members, supplies and territory.

Five members of the "39ers" pleaded guilty and cooperated, testifying for the Government at trial: Darryl Franklin, Tyrone Knockum, Gregory Stewart, Washington McCaskill, and Rico Jackson. Through testimony from these cooperators, the Government sought to prove that the 39ers was an enterprise and not merely a loose association of people, that the 39ers engaged in drug-trafficking together, and that they shared a gun conspiracy. As relevant to this appeal, at trial the prosecution focused on nine incidents: (1) the murder of Kendall Faibvre and the shooting of Jasmine Jones on February 22, 2010; (2) the murder of Lester Green and the shooting of Jamal Smith on May 19, 2010; (3) the murder of Donald Daniels on May 27, 2010; (4) the murder of Elton Fields on October 11, 2010; (5) the murders of Jerome Hampton and Renetta Lowe on December 20, 2010; (6) the murder of Littlejohn Haynes on February 20, 2011; (7) the assaults of Albert Hardy, Kelvin Baham, and Carrie Henry on May 22, 2011; (8) the murder of Gregory Keys and the shooting of Kendrick Smothers on May 24, 2011; and (9) the murder of Michael Marshall on September 14, 2011.

Evidence introduced by the prosecution at trial included expert testimony on ballistics, testimony from law enforcement, and Title III calls. In addition, two music videos and one song were played.

Jury deliberations began on day 25 of the trial. The verdict, returned on day 28, resulted in the following convictions:

1. Ashton Price was found guilty of the Count 1 RICO conspiracy, the Count 2 drug conspiracy, and the Count 3 firearms conspiracy. He was also convicted on counts involving the deaths and assaults of Kendall Faibvre, Jasmine Jones, and Michael Marshall; however, he was

found not guilty on counts associated with the deaths of Terrance Dennis, Anthony Charles Brown, Jr., and Rayshon Jones.

2. Leroy Price was found guilty of the Count 1 RICO conspiracy, the Count 2 drug conspiracy, the Count 3 firearms conspiracy, and the murders of Lester Green, Jamal Smith, Donald Daniels, Elton Fields, and Michael Marshall; however, he was found not guilty of causing death through the use of a firearm for each of those murders.

3. Alonzo Peters was found guilty of the Count 1 RICO conspiracy, the Count 2 drug conspiracy, and the Count 3 firearms conspiracy; however, he was found not guilty on all other charged counts.

4. Jasmine Perry was found guilty of the Count 1 RICO conspiracy, the Count 3 firearms conspiracy, and the murders of Kendall Faibvre and Gregory Keys. He was also found guilty of assault with a dangerous weapon in aid of racketeering as to Jasmine Jones, Albert Hardy, Kevin Baham, Carrie Henry, and Kendrick Smothers. Perry was found not guilty of charges relating to the death of Littlejohn Haynes, Terrance Dennis, and Anthony Charles Brown, Jr.

5. McCoy Walker was found guilty of the Count 1 RICO conspiracy, the Count 2 drug conspiracy, and the Count 3 firearms conspiracy; he was also found guilty of charges associated with the murders of Lester Green, Jerome Hampton, and Renetta Lowe, as well as the assault of Jamal Smith. He was found not guilty of charges associated with

the assault of Elton Williams, Quiniece Noble, and the use of a firearm in the death of Lester Green and assault of Jamal Smith.

6. Terrioues Owney was found guilty of the Count 1 RICO conspiracy and the Count 3 firearms conspiracy, as well as counts associated with the murder of Lester Green, Donald Daniels, Elton Fields, Jerome Hampton and Renetta Lowe. He was also found guilty of the assault of Jamal Smith.

7. Evans Lewis was found guilty of the Count 1 RICO conspiracy and the murder of Littlejohn Haynes. He was found not guilty of charges relating to the deaths of Anthony Charles Brown, Jr. and Lester Green, and the assault of Jamal Smith.

8. Curtis Neville was found guilty of the Count 1 RICO conspiracy, the Count 2 drug conspiracy, and the Count 3 firearms conspiracy, as well as counts associated with the murder of Littlejohn Haynes and the assaults of Albert Hardy, Kelvin Baham, and Carrie Henry. He was also found guilty of possession with the intent to distribute heroin, and possession of a firearm in furtherance of a drug trafficking crime.

9. Solomon Doyle was found guilty only of the Count 1 RICO conspiracy. He was found not guilty of the Count 3 firearms conspiracy, as well as counts associated with the murder of Littlejohn Haynes.

10. Damian Barnes was found guilty of the Count 1 RICO conspiracy, the Count 2 drug conspiracy, and the Count 3 firearms conspiracy. He was found not guilty of counts associated with the murder of Floyd Moore.

No. 17-30610
c/w No. 17-30611

After trial, all defendants moved for acquittal or a new trial, and they supplemented their motions after a letter came to light in which cooperating witness Washington McCaskill characterized "our Federal Case" as "all made up lies." The district court denied all motions, and sentenced defendants. All defendants but Doyle and Barnes received life sentences. They timely noticed their appeals.

## II. Discussion

Defendants raise numerous arguments for reversing their convictions. We analyze each of their main arguments in turn.

## A. Sufficiency of Evidence[2]

Eight defendants argue before us that there was insufficient evidence to support their convictions. All defendants moved for judgment of acquittal both at trial and post-trial. Accordingly, we review their claims *de novo*, giving "substantial deference to the jury verdict." *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018) (citation omitted). Under this standard:

> We search the record for evidence supporting the convictions beyond a reasonable doubt, and review the evidence in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury. In other words, a defendant seeking reversal on the basis of insufficient evidence swims upstream.

*United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (cleaned up).

---

[2] This case involved a jury trial that lasted for weeks, and we do not attempt to provide a full summary of all evidence presented at trial in this opinion. Rather, we discuss those challenges to the sufficiency of evidence that defendants fully developed in their briefs.

No. 17-30610
c/w No. 17-30611

## 1. Credibility of Cooperating Witnesses

A threshold issue for some of the sufficiency challenges raised by several defendants involves the credibility, or lack thereof, of cooperating witnesses. Defendants Leroy Price, Walker, Owney, and Perry all spend portions of their briefs arguing that that the cooperating witnesses were not credible and that there was insufficient evidence to support their convictions *outside of* the cooperating witness testimony. For example, Owney's brief contends that:

> Owney was indicted for four murders and one assault. For each of these criminal acts, one of the unindicted, immunized co-conspirators was responsible and so admitted. . . . A complete review of the record demonstrates that other than the testimony of the government's witnesses, the government has no evidence to prove beyond a reasonable doubt that Owney committed the alleged offenses.

The sufficiency challenges raised by defendants that depend only on challenges to the credibility of cooperating witnesses include: (1) the murder of Lester Green and the shooting of Jamal Smith in May of 2010; (2) the murder of Donald Daniels on May 27, 2010; (3) the murder of Elton Fields on October 11, 2010; and (4) the murder of Gregory Keys and the shooting of Kendrick Smothers.

To successfully challenge the sufficiency of evidence supporting a conviction, it is not enough for a defendant to argue that he was convicted on the uncorroborated testimony of a co-conspirator. This Court has long held that "a defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain," so long as the coconspirator's testimony is not "incredible." *United States v. Villegas-Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999). "Testimony is incredible as a matter of law only if 'it relates to facts that the witness could not possibly

have observed or to events which could not have occurred under the laws of nature.'" *United States v. Booker*, 334 F.3d 406, 410 (5th Cir. 2003) (quoting *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994)). Thus, we have allowed convictions supported only by one witness' testimony to stand, "[w]hatever the problems" with that witness' credibility, if the "account was neither physically impossible nor outside his powers of observation." *United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir. 2021). We do so because "the jury decides credibility of witnesses, not the appellate court." *Id.* (citing *United States v. Delgado*, 256 F.3d 264, 273-74 (5th Cir. 2001)). As the trial court in this case noted, the jury was presented directly with many challenges to the credibility of the witnesses:

> All of the cooperators were subject to extensive and lengthy cross-examination by defense counsel. All parties knew from the beginning that the cooperators' credibility was central to the Government's case, and each defendant benefited from every other defendant's attack on the cooperators. The Court allowed extensive discovery as to the cooperators' jailhouse calls. The jury was fully aware of the many credibility issues surrounding the cooperators but the jury nevertheless credited portions of their testimony. Their testimony was not incredible or facially insubstantial.[3]

Accordingly, we defer to the credibility determinations of the jury, and we reject the challenges to the sufficiency of the evidence based solely upon such credibility determinations.

---

[3] Moreover, we note that the jury was instructed that "the testimony of a witness who provides evidence against a defendant for personal advantage, such as the possibility of a reduced sentence, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the witness's testimony has been affected by self interest, or by prejudice against the defendant."

No. 17-30610
c/w No. 17-30611

2. RICO Conspiracy Convictions (Count 1)

Several defendants challenge their RICO conspiracy convictions on appeal.[4]  "Conspiracy to violate any of RICO's substantive provisions is a crime." *United States v. Jones*, 873 F.3d 482, 489 (5th Cir. 2017) [hereinafter *Jones I*] (citing 18 U.S.C. § 1962(d)). "The elements of a RICO conspiracy are: (1) an agreement between two or more people to commit a substantive RICO offense; and (2) knowledge of and agreement to the overall objective of the RICO offense." *United States v. Onyeri*, 996 F.3d 274, 280 (5th Cir. 2021) (citing *United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015); 18 U.S.C. § 1962). "These elements may be established by circumstantial evidence." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005); *see also United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) ("The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances." (internal quotation marks and citation omitted)).[5] "A co-conspirator needs only to have known of, and agreed to, the overall objective of the RICO offense." *Jones I*, 873 F.3d at 489 (citing *Salinas v. United States*, 522 U.S. 52, 61-66 (1997)). "Although a defendant's mere presence at the scene of a crime is not, by itself, sufficient to support a finding that the defendant is participating in a conspiracy, presence and association may be

---

[4] Though we have examined the Count 2 drug conspiracy challenges by those defendants who raised them, we do not perceive any arguments that are separate and cognizable from their main Count 1 sufficiency arguments.

[5] Perry contends that there is a three-part test, set out in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), to determine sufficient participation in the conduct of an organization's affairs to be convicted of a RICO conspiracy. However, in *Posada-Rios*, 158 F.3d at 857, this Court rejected the use of that test for RICO *conspiracy* charges (*Reves* interpreted 18 U.S.C. § 1962(c), not § 1962(d)) and instead adopted the two-step standard set out above. *See also Rosenthal*, 805 F.3d at 532.

considered by the jury along with other evidence in finding that the defendant participated in a conspiracy." *Posada-Rios*, 158 F.3d at 857-58.

Here, defendants were charged under § 1962(d)[6] with conspiring to violate § 1962(c), which criminalizes racketeering activity by making it: "[U]nlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A "pattern of racketeering activity" is at least two acts of racketeering activity that occurred within ten years of each other. 18 U.S.C. § 1961(5). "Racketeering activity" includes state felony offenses involving murder, robbery, and several other serious offenses, as well as serious federal offenses including narcotics violations. 18 U.S.C. § 1961(1).

An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §§ 1959(b)(2), 1961(4). Although RICO "does not specifically define the outer boundaries of the 'enterprise' concept," the "term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. "The term 'enterprise' encompasses 'an amoeba-like infra-structure that controls a secret criminal network' as well as 'a duly

---

[6] *See* 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.").

No. 17-30610
c/w No. 17-30611

formed corporation that elects officers and holds annual meetings.'" *Jones I*, 873 F.3d at 490 (quoting *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978)).

Defendants' main challenges to the conspiracy convictions fall into two categories: (1) that there was insufficient evidence to show the "39ers" was an enterprise; and (2) that there was insufficient evidence of individual defendants' involvement in the 39ers. We examine each in turn.

### i. The "39ers" Enterprise

Defendants Owney, Walker, Neville, and Leroy Price contend that the Government did not put on sufficient evidence to show that the 39ers was an enterprise. Defendants point to testimony from cooperating witness Franklin, in which he said that New Orleans did not have gangs, just organizations, and that "Y'all consider us a gang. We consider ourselves as partners."[7] Defendants contend that the alliance at the heart of the 39ers was too loose of an association to meet the definition of an enterprise.

We have previously recognized gangs with clear, collective and criminal purposes as RICO enterprises. In *Jones I*, defendants similarly argued that the alleged gang, Ride or Die (ROD), was not an enterprise but rather "just a bunch of young men who really like hanging out" and who occasionally pooled resources. *Jones I*, 873 F.3d at 490. We did not find that argument convincing, instead holding that "ROD had a clear purpose— selling drugs and protecting those drug sales and the group's members—and its members were associated with one another" because they used a communal house to work out of, pooled their money on at least one occasion

---

[7] This testimony is not enough to overcome the reasonable inference drawn by the jury that the 39ers was an enterprise, because defendants do not attempt explain why organizations or partners cannot be enterprises.

11

No. 17-30610
c/w No. 17-30611

to buy drugs, divided territories, and stashed guns for other members' use, alongside committing violent crime. *Id.* Defendants do not persuasively distinguish the 39ers from ROD.[8] There was testimony in this case about meeting at a house, working out of hotel rooms, sharing guns, selling drugs and organizing and communicating to do so, and committing violent crimes. Furthermore, as the Government points out, the "39ers' repeated drug-trafficking, sharing of guns, retaliatory and proactive violence, and cooperation from members of different parts of the group" all help support the jury's verdict that the 39ers was an enterprise. We therefore hold that the 39ers was an enterprise because it, like ROD, had a clear, collective, and criminal purpose – in this case, the purpose was selling drugs and protecting

---

[8] The indictment provided the following purposes of the 39ers enterprise:

4. The purposes of the enterprise include, but are not limited to, the following:

a)  Enriching the members and associates of the enterprise through, among other things, the control of and participation in the illegal distribution of controlled substances in the territory controlled by the enterprise;

b)  Enriching the members and preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, violence, and threats of violence, including assault, murder, and attempted murder;

c)  Promoting and enhancing the activities and authority of the enterprise and its members, and associates;

d)  Keeping victims, potential victims, and witnesses in fear of the enterprise and in fear of its members and associates through violence and threats of violence;

e)  Providing financial support and information to members and associates of the enterprise, including but not limited to those who were incarcerated, for committing acts of violence, illegal possession and distribution of controlled substances, and other offenses, and;

f)  Providing assistance to members and associates of the enterprise who committed crimes for an on behalf of the enterprise in order to hinder, obstruct, and prevent law enforcement officers from identifying, apprehending, and prosecuting the offender or offenders.

those drug sales and the group's members and territory (often through violent means).

### ii. Connection to the 39ers

Defendants Owney, Walker, Peters, Ashton Price, Neville, Perry, and Leroy Price also argue in the alternative that, even if the 39ers could be considered an enterprise, they had no involvement in it. However, most of their arguments lack the completeness necessary to challenge the sufficiency of evidence of their convictions. For example, Perry argues in part that he was not implicated in photographs of the 39ers and that he was not named by some cooperators; Leroy Price argues in part that FBI Agent Jonathan Wood admitted that he never saw Leroy Price do any hand-to-hand transactions. Yet it is not enough for defendants to argue that they were less implicated than other defendants. "Once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy." *United States v. Virgen-Moreno*, 265 F.3d 276, 285 (5th Cir. 2001); *see also Posada-Rios*, 158 F.3d at 858 (holding that a defendant can be convicted of conspiracy even if "he only participated at one level . . . and only played a minor role"). Defendants have not shown that the evidence here is insufficient such that this Court would overturn a verdict finding them guilty of a RICO conspiracy.

The most developed individualized argument comes from Alonzo Peters. Peters argues that there was insufficient evidence to support his convictions, especially because his activities were not linked to the 39ers as an enterprise. He argues that, at most, the Government was able to show a personal relationship with cooperating witness Stewart, from whom he

bought drugs.[9] However, the jury heard, among other things: testimony from cooperating witness Stewart that Peters rented out hotel rooms and "knew about what we do" in those rooms; testimony from Stewart that Peters sold drugs; testimony from a Marriott employee that Peters rented rooms with an employee discount and that a gun was found in one of the rooms; and phone calls between Peters and Stewart. Given our deference to the jury's verdict upon review, we conclude that there was sufficient evidence for all three of Peters' convictions.

### 3. VICAR Violation Convictions

Several defendants also challenge the sufficiency of the evidence supporting their convictions for violations of VICAR, 18 U.S.C. § 1959(a).[10] "To establish that a defendant has violated VICAR, the government must show that (1) an enterprise existed; (2) the enterprise engaged in, or its activities affected, interstate commerce; (3) it was engaged in racketeering activity; (4) the defendant committed violent crimes; and (5) the defendant committed the violent crimes to gain entrance to, or maintain or increase his position in, the enterprise." *Jones I*, 873 F.3d at 492; *see also United States v. Portillo*, 969 F.3d 144, 164 (5th Cir. 2020). We will reverse convictions under

---

[9] We note that the jury was instructed that "[t]he fact that a defendant may have bought drugs from another person or sold drugs to another person is not sufficient without more to establish that the defendant was a member of the charged conspiracy. Instead, a conviction requires proof of an agreement to commit a crime beyond that of the mere sale."

[10] Section 1959(a) provides that "[w]hoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires to do so, shall be punished . . . ." 18 U.S.C. § 1959(a).

the fifth element if the prosecution cannot show enough of a connection between the violent crime and the enterprise, such that the jury could not have reasonably concluded that the violent crime was done in furtherance of the conspiracy. *See Jones I*, 873 F.3d at 493.

### i. Littlejohn Haynes Murder

Defendants Lewis and Neville argue there is not enough evidence connecting the Haynes murder to the 39ers enterprise to support their convictions on that count. Several witnesses provided relevant testimony about the Haynes murder. Cooperating witness Franklin testified on direct examination that there were two "problem[s]" with Haynes: (1) Haynes gave someone a gun that killed Giz,[11] and (2) Haynes sent someone to steal drugs that belonged to Stewart. Cooperating witness Franklin also testified that he did not want to see Haynes murdered, though he "knew it was going to happen to him." Thus, when Haynes approached Franklin on the day Haynes was killed, Franklin told Haynes to leave. Cooperating witness Stewart testified that he wanted to kill Haynes "[b]ecause he robbed one of my customers out the drugs that I was fronting them" and that "[Lewis] wanted to kill him because he killed Giz." Cooperating witness McCaskill testified that he would not have wanted Haynes to be murdered had he known of the homicide in advance, and that he was upset when he found out and tried to track down those responsible.

Based on this testimony, defendants Lewis and Neville argue that the evidence presented at trial was insufficient to establish that they committed the Haynes murder to maintain or increase their positions in the 39ers. Rather, they contend that the murder was clearly motivated by a personal

---

[11] Franklin also testified that Giz was a friend of some of the men from the Florida Projects.

feud begun by the death of Giz and was actually opposed by Franklin and McCaskill. Nonetheless we hold that that, given Franklin's testimony regarding the alternative motive of stolen drugs, as well as testimony that one needed to "be ready" to kill to prevent word getting out that one's drugs had been stolen, there was sufficient evidence for the jury to make the reasonable inference that the murder was committed in furtherance of the charged conspiracies.

## ii. Faibvre Murder

Defendants Perry and Ashton Price argue that there was insufficient evidence supporting their convictions stemming from the murder of Kendall Faibvre and the shooting of Jasmine Jones on February 22, 2010. Defendants argue that there was conflicting evidence related to the murder, including eyewitness identification of a different man by Jasmine Jones. Additionally, they argue that the murder lacks a link to the 39ers enterprise. In response, the Government highlights testimony from cooperating witness Stewart, who testified that he had a friend named Percy from the Florida Projects who was shot by men from Press Park, and that, subsequently:

> Well, Percy is [Peters'] partner, and [Peters] was acting like he was scared of them dudes. Like, he wrecked the man car, like, he was scared of them dudes. And I told him, I'm like, "Man, you got to handle your business. If one of my close partners like that get shot like that, I want to ride behind them, like. It don't matter how it go. I am gonna ride behind them. I got to kill somebody behind them." So I'm telling [Peters], like, "Man, we got to handle that. I want to help you."

Stewart then described the chronology of the shooting itself. The jury also heard testimony from Franklin that he was "aware" that Stewart retaliated for Percy because "[i]t was Jasmine Perry's first time catching a body. So you're going to brag about it. It's like when you go to the prom that night or getting your diploma or whatever." Franklin further testified that "Jasmine

Perry and them, they're happy. Because, you know, you struck my team, and I struck back, you know. You paralyzed one, and I killed one of yours." Additional evidence before the jury included the autopsy, Jasmine Jones' medical discharge sheet, crime scene photographs, and spent casings recovered from the scene. This evidence was sufficient to support the convictions. There was a connection to the 39ers because the jury could have credited Stewart's testimony and made the reasonable inference that the men acted to protect the 39ers' territory and members.

### iii. Marshall Murder

Ashton Price argues that there was insufficient evidence he was involved in the Michael Marshall murder[12] and also that there was no connection between the murder and the 39ers, because "[t]his was simply a murder for hire." Price argues that the only evidence linking him to the murders is the testimony of cooperating witnesses Franklin and McCaskill.

Franklin testified that "Somebody put a hit over [Marshall's] head. Pound and Big Wash took it, and Leroy was the driver."[13] According to Franklin, "Merle told me that Big Floyd came at him, telling him that he needed somebody knocked off, which one of them he could holler at." "Big Floyd wanted Michael dead because Michael wore a wire on him for some coke and set him up with a drug agency that took him down."[14] Big Floyd was not a 39er. For his part, McCaskill testified that he (McCaskill) was known as a killer, that he remembered being paid to kill a man named Michael

---

[12] Leroy Price also argues that there was insufficient evidence linking him to this crime.

[13] The jury heard testimony that Ashton Price had the nickname of "Pound."

[14] The jury also heard testimony from a DEA Special Agent about controlled buys involving Marshall as a confidential source.

Marshall, and that, though he knew the man who made the introduction the day he received the hit, he did not know the man who paid him and he did not know Marshall. McCaskill also testified in detail as to Leroy Price and Ashton Price's involvement before, during, and after the shooting, and he described the guns and car used. We hold that the above testimony is sufficient evidence of Leroy and Ashton Price's involvement in the Marshall murder.

In response to Ashton Price's challenge to the connection between the murder and the 39ers, the Government argues that, though it is true that the controlled buy did not involve 39ers or their drugs, Big Floyd went to the leaders of the 39ers specifically and was told to seek out Washington McCaskill. Franklin testified that McCaskill had a reputation as a killer, saying: "You need a killer – take a hit or whatever, he's a killer. That's what he do"; and "You can call any one of them. If the money right, they'll do it." This reputation was important both to McCaskill's position within the 39ers as well as to the 39ers' own reputation as an organization that was willing to commit violence. By participating in the violence, Ashton and Leroy Price were also able to enlarge their reputations.[15] The jury heard extensive testimony about the need for a reputation of violence when running a drug enterprise in New Orleans.[16]

---

[15] Franklin testified that Ashton Price described the hit to him after it happened. Two rap videos by Ashton Price also involved facts that the jury may have inferred lined up with the facts of the Marshall murder.

[16] For example, Franklin testified that:

> Oh, you got to have killers. You got to be ready to kill. Because if you – if you think you're going to run in the project in New Orleans by yourself, or you and five people, that's not going to happen. Someone going to sooner or later come jack you and take what you got. Then, when word get out on the street that you've been jacked and pushed around, they

No. 17-30610
c/w No. 17-30611

We find the Government's argument convincing. As acknowledged by the Government at oral argument, a VICAR conviction cannot stand if its only foundation is the fact that a member of a gang committed some act of violence. *See United States v. Ledbetter*, 929 F.3d 338, 356 (6th Cir. 2019) (holding that the "work of a single person, who happened to be in a gang" is not enough to show sufficient evidence of racketeering purpose, because to find otherwise "would be to convert the violent-crimes-in-aid-of-racketeering statute into a gang-status crime, punishing any and all violent crimes by gang members, no matter their relation to a racketeering enterprise"). Nonetheless, as discussed above, this shooting involves a sufficient connection to the reputations of McCaskill, Ashton Price, and Leroy Price, as well as to the reputation of the 39ers, as demonstrated through the testimony of Franklin and McCaskill. Other facts in the record also would have allowed the jury to reasonably infer that this killing was committed in part to solidify the reputation of the 39ers: (1) the gruesome and excessive nature of the shooting, as demonstrated though the autopsy and photos; (2) the fact that McCaskill elicited help from fellow 39er members when he was recruited for the hit (Ashton and Leroy Price); (3) testimony that, by murdering confidential informants, even those who were

---

got other people come and do it too. So you need a team of killers, and you got to be – you know, be ready.

Franklin said that "When you don't kill or finish your kill, you're going to get drive, like you ain't about your business, you didn't do it right, you're stupid, you're dumb, look at you." According to Franklin, "[T]hat's the life we live. You kill one of ours, we're going to kill one of yours. That's the rule. That's how the game go. That's the life we chose. That's how we operate." Similarly, Stewart testified that "[A]t the end of the day, if I don't kill them people, they gonna kill me. So why would I just wait for them to kill me? I'm not gonna do that, I am going to be smart and kill them first," and that "I got aggressive and made sure that whenever we catch one of them, we gonna make sure we kill them." The jury also heard testimony that the leaders of the 39ers "favored" those who were "consistent" in their killing.

19

not working against the 39ers, the 39ers sent a warning that they would be willing to violently take action against anyone informing against them. Given the record before us, we conclude that there was sufficient evidence to support these convictions.

### iv. Hampton Murder

Walker argues that the murder of Jerome Hampton "was not connected to any RICO conspiracy" because "the beef began in Texas for unrelated reasons."[17] Walker bases his argument on testimony from cooperating witness Rico Jackson, in which Jackson stated that he had witnessed Hampton kill someone in Texas. However, the jury also heard testimony from Knockum and Stewart that members of the 39ers had decided that Hampton was "a problem," both because he was willing to kill members of "our neighborhoods" if they were caught outside of the neighborhoods and because they thought he was going to kill Merle Offray since he was "behind supplying Third and G." Stewart testified that he was told to "handle that," and he described the details to the jury. We hold that there was sufficient evidence that this murder was connected to the 39ers.[18]

---

[17] Walker also argues that there was insufficient evidence connecting him to the murder of Hampton, because "the only way to connect Appellant to any of these shootings was through the testimony of admitted murderers." Yet for the reasons set out in Part II.A.1, this is not a sufficient argument to reverse a conviction for lack of sufficient evidence on appeal.

[18] Walker also briefly argues that "[b]ecause Lowe was not the target of the shooting… neither can Lowe be considered a murder in aid of racketeering." Yet Franklin testified that Hampton and Lowe were both shot in the same shooting: Lowe was driving the car, the car crashed when they began shooting, and ultimately both Lowe and Hampton were "shot until they was dead."

No. 17-30610
c/w No. 17-30611

## v. Hardy, Baham, Henry Assaults

Perry also challenges the sufficiency of the evidence supporting his convictions stemming from the assaults of Albert Hardy, Kelvin Baham, and Carrie Henry on May 22, 2011. Perry argues that the evidence against him was "both slim and contradicted"; however, the record contains testimony from Franklin, Stewart, and McCaskill describing Perry's involvement in the assault, and we conclude that this testimony is sufficient evidence. There is also sufficient evidence supporting the assaults' connection to the 39ers enterprise. Franklin testified that Hardy was "a problem" and "had to go" because he "killed the guy, Dan, out of our project" and "told somebody that he'll swing on G-Strip and stuff like that. He ain't scared of us. He'll swing around there. . . and, you know, give it to one of us, if he was to catch us." McCaskill testified that "he sent a message, like what he gonna do if he catch anybody from our crew or catch anybody around there, what he gonna do." Stewart provided similar testimony.

## B. Motions for New Trial

All defendants filed motions for a new trial. Several defendants now urge this Court to weigh the evidence of the cooperating witnesses when reviewing the district court's denial of the motions for new trial. However, we have previously held that "[i]n our capacity as an appellate court, we must not revisit evidence, reevaluate witness credibility, or attempt to reconcile seemingly contradictory evidence." *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (citing *United States v. Dula*, 989 F.2d 772, 778-79 (5th Cir. 1993)). Arguments to undertake such evaluations may be "appropriate in the district court in connection with a rule 33 new trial motion – because that court has the authority to make its own determination regarding the credibility of witnesses," but they are "inappropriate in this court, because we do not have such authority on appellate review." *United States v. Arnold*,

416 F.3d 349, 360-61 (5th Cir. 2005). Furthermore, "where the defense has had an opportunity to question witnesses as to their biases, and the jury has concluded that the witnesses are credible, the trial court has broad discretion in ruling on a motion for a new trial." *United States v. Thompson*, 945 F.3d 340, 347 (5th Cir. 2019) (internal citation and quotation marks omitted). In our capacity as an appellate court, "we must simply concern ourselves with whether or not the district court's ultimate decision in granting or denying the motion for a new trial constituted a clear abuse of its discretion." *Tarango*, 396 F.3d at 672 (citing *Dula*, 989 F.2d at 778-79). We do not find a clear abuse of discretion here.

## C. Evidentiary Rulings

"We 'review a district court's evidentiary rulings for abuse of discretion,' subject to harmless-error analysis." *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011) (quoting *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999)).

### 1. Admission of Shocking Photographs[19]

Defendants object to shocking and gruesome photographs shown to the jury at trial as unduly prejudicial under Federal Rule of Evidence 403. Rule 403 provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. "However, the standard for assigning error under Rule 403 is especially high and requires a showing of clear abuse of

---

[19] With regard to the photographs and Ashton Price's rap songs, defendants argue both that the evidence should have been excluded under Federal Rule of Evidence 403, and, alternatively, that their trials should have been severed. We address the severance argument separately.

No. 17-30610
c/w No. 17-30611

discretion." *United States v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011) (cleaned up).

We have previously allowed shocking and gruesome photographs to be shown to the jury in murder cases so long as those photos had a nontrivial probative value. *See United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007) ("Many of the photos are, as the defendant posits, shocking. However, our caselaw indicates that admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value."). In *United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018), we found no abuse of discretion by the district court for admitting shocking photographs where the prosecution's theory of the case was that the defendant wanted the murders to appear to be cartel-related and that the cartel was "known to commit exceedingly grisly" murders; the photographs thus provided nontrivial probative value. *Id.* at 538-39. This Court has also found nontrivial probative value in photographs "proving overt acts committed in furtherance of" a conspiracy. *United States v. Martinez-Herrera*, 539 Fed. App'x 598, 602 (5th Cir. 2013) (unpublished).

Here, defendants cite to four specific photographs that they argue are especially gruesome and prejudicial.[20] The photographs depict the dead bodies of Renetta Lowe and Michael Marshall with open wounds, blood and gore. They are, indeed, shocking. However, the photographs had nontrivial probative value: they helped to prove overt acts committed in furtherance of the conspiracy, they established the violence of the deaths of both Lowe and Marshall, and they lent support to the cooperators' testimony about the details of each shooting. Though Peters and Neville correctly argue that the

---

[20] Before any of the crime scene photographs were shown to the jury, defendants objected to their admission. As a result, the trial court excluded some but admitted others (those that defendants challenge here).

photographic evidence was prejudicial, they do not explain why the evidence did not have significant probative value as to the violence that was a part of the alleged conspiracy. *See United States v. Barnes*, 803 F.3d 209, 220 (5th Cir. 2015) ("Here, the evidence of the Smith Triple Murder was directly relevant to the conspiracy charges because it showed that the Appellants were willing to use firearms in furtherance of their drug trafficking activities."); *United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir. 2001) (withdrawn in separate part by *United States v. Baptiste*, 309 F.3d 274 (5th Cir. 2002)) ("Although the evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature of the conspiracy."); *United States v. Abrego*, 141 F.3d 142, 176 (5th Cir. 1998) ("The acts of violence to which the evidence at issue here related were integral parts of the conspiracies and the CCE with which Garcia Abrego was charged.").

Peters also argues that "[t]he fact that persons died because of certain, specific gang activities, could have been presented through autopsy diagrams and crime scene photos not depicting the bodies and gruesome, violent deaths they suffered." However, the "abuse of discretion standard for a Rule 403 decision is not satisfied 'by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon.'" *United States v. Velasquez*, 881 F.3d 314, 336 (5th Cir. 2018) (quoting *Old Chief v. United States*, 519 U.S. 172, 183 n.7 (1997)).[21]

---

[21] Peters separately argues that the photographs were unduly prejudicial against him because he had no involvement in the conspiracy. He compares his case to *United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005), stating that "there was no evidence of a connection between Mr. Peters and the 39ers or any other enterprise" and that the "probative value of the photos was far, far outweighed by the prejudice that their admission and display had on Mr. Peters," since their admission served "no other purpose than to poison the jury against Mr. Peters, with images that had nothing to do with him or any fact at issue." However, as discussed earlier in this opinion, at trial the jury saw other testimony

No. 17-30610
c/w No. 17-30611

## 2. Admission of Ashton Price's Rap Songs

In a pre-trial order, the court examined the admissibility of the Government's proposed list of songs performed by Ashton Price and, after considering each separately, reduced it significantly. At trial, the jury saw two rap music videos and heard the audio of one rap song. When the evidence was shown, the jury was told that it was not admissible against defendants Owney, Lewis, Doyle, Peters and Perry.

The lyrics of the songs mentioned violence, specific types of guns, drug sales, the nicknames of two cooperating witnesses, and details that corresponded with details of the Michael Marshall killing. The jury also heard testimony from cooperating witness Franklin about how money from the drug distribution supported the label the songs were produced under, as well as testimony about how the lyrics related to the 39ers and how Ashton Price was picked to be the main rapper.

### i. Ashton Price Arguments

The most detailed arguments that the district court abused its discretion in admitting the rap videos come from Ashton Price. He argues that the songs were hearsay and that their introduction as evidence violated Federal Rules of Evidence 403 and 404(b). We recently considered the admissibility of rap videos for the first time, and in making our analysis, we noted that "[t]he general conclusion from courts that have considered this type of evidence is that explicit rap videos are probative and outweigh substantial prejudice when the defendant performs the song, describes events closely related to the crime charged, and the evidence is not cumulative."

and evidence linking Peters to the 39ers. On the facts before us we do not find an abuse of discretion where, though Peters was not involved in the murders shown in the photographs, the prosecution's case depended on establishing the existence of the 39ers conspiracy.

No. 17-30610
c/w No. 17-30611

*United States v. Sims*, 11 F.4th 315, 323 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 827 (Jan. 10, 2022). In *Sims*, we did not find an abuse of discretion where the defendant performed in all three videos, the lyrics described the facts of the case and were performed after the actions at issue in the case, and the depictions of firearms, factual details, and violence were relevant to the government's case. *Id.* at 324.

We find that this case closely mirrors *Sims*. Ashton Price performs in the three pieces, and in them he describes conduct and themes that were directly relevant to the Government's case. At oral argument, counsel for Ashton Price argued that *Sims* is distinguishable from this case because of the failure in this case to establish authorship. Yet Price himself performed in the pieces, and the jury heard testimony from Franklin about how he became the main rapper for the label. We are not persuaded that the district court abused its discretion in admitting the three songs.

### ii. Other Defense Arguments

The three songs were also admissible against defendants Leroy Price, Neville, Barnes, and Walker, because the limiting instruction given by the trial court did not include them. We find no abuse of discretion; the songs were admissible under Federal Rule of Evidence 801(d)(2)(E), as statements of a co-conspirator during and in furtherance of the conspiracy. None of these four defendants points to any specific lyric that would not fall under this hearsay exclusion.

### 3. Admission of Agent Wood's Summary Testimony

Neville argues that FBI Special Agent Jon Wood's "testimony largely served as a comprehensive summary of the Government's entire case-in-chief and as a means to vouch for and bolster the credibility of the Government's cooperating witnesses." In making this argument, however, Neville overlooks that the district court sustained numerous objections,

issued limiting instructions, and permitted unimpeded opportunity to cross-examine the witness. Thus, the trial court's careful monitoring of the testimony rendered any potential error from summary testimony harmless. *See United States v. Nguyen*, 504 F.3d 561, 573 (5th Cir. 2007) ("In sum, once again we caution the government not to rely on improper summary witness testimony. Because the error was harmless given the strength of the government's case and the district court's limiting instructions, however, we reject [the defendant's] request for a new trial.").

### 4. Admission of Ballistics Evidence and Testimony

Defendants Lewis, Perry and Walker challenge the admissibility of ballistics evidence as presented by Government expert witness Meredith Acosta. The lead-up to the eventual admission of ballistics in this case was long and eventful. Defendants first raised issues with the ballistics documentation at a pretrial status conference on November 28, 2016, and as a result the district court ordered the Government to "work with the Defendants' ballistics expert to make available any physical evidence necessary to the expert's evaluation" and to "provide Defendants with the 'raw materials' that the Government's ballistics experts used to generate their conclusions." The Government then provided further materials to the defendants, who moved to exclude Acosta's testimony or, in the alternative, for a *Daubert* hearing. Defendants attached a declaration from defense expert Edward Hueske to their motion, stating that the documentation provided was missing materials "necessary to assess the accuracy of firearm tool mark identification;" that there was "no expected supporting documentation" for the conclusions offered in the reports; that the New Orleans Police Department Firearms Unit was not was accredited and thus was not required to provide documentation; and that, in conclusion, he was "unable to offer any meaningful opinion as to the scientific reliability of the Government's ballistic expert's conclusions."

No. 17-30610
c/w No. 17-30611

Five days before trial, the Government produced more underlying materials. Three days before trial, the district court denied, without discussion, the motion to exclude testimony and for a *Daubert* hearing, and it ordered the Government to produce the rest of the materials. The Government made another production, which defense counsel still claimed was deficient. On the second day of trial, the parties again addressed the ballistic expert productions, and the trial court held that the issues went to the weight of the evidence but not to its admissibility. Defendants filed another motion, re-urging the exclusion of Acosta's testimony and attaching another letter from Hueske explaining that the under-documentation in the case prevented independent review. The trial court denied the motion.

The day before Acosta's testimony, the Government provided 419 additional pages of documents. Defense counsel objected, and the trial court sanctioned the Government, denying Acosta the opportunity to refer to any of the recently-produced documents. The Government called Acosta to testify. Here, we address two issues: whether the Government's conduct necessitated further sanctions, and whether the testimony met the *Daubert* standard.

### i. Discovery Sanctions

Defendants argue that the district court should have sanctioned the Government under Federal Rule of Criminal Procedure 16(a)(1)(F), (G),[22] because the late disclosure of expert materials meant that Acosta's work was unreviewable by the defense expert. At trial, the district court allowed Acosta to testify to her work and conclusions, and it only sanctioned the Government

---

[22] Rule 16(a)(1)(F) requires the Government to "permit a defendant to inspect and to copy or photograph the results or reports . . . of any scientific test or experiment" so long as it meets certain general criteria. Rule 16(a)(1)(G) requires the Government to provide "a written summary" of the expert's testimony.

in that it did not allow Acosta to refer to the documents disclosed the day of her testimony. The district court addressed the lack of further sanctions in an order denying defendants' motions for acquittal or new trials, writing that it did "not take issue with the contention that the ballistics evidence should have been produced much earlier." However, the court concluded that there was "no bad faith on the part of the Government" and explained that because "there has been no suggestion that the new photographs undermined Acosta's findings in any specific manner," there was "no prejudice from the late production."

"We review a district court's imposition of sanctions for discovery violations for an abuse of the district court's discretion." *United States v. Garrett*, 238 F.3d 293, 297 (5th Cir. 2000). Here, the district court did provide sanctions, though not the full suppression defendants requested. Notably, the district court disallowed reference to the 419 belatedly-produced pages. On the record before us, where the trial court explicitly found no bad faith, and where certain sanctions *were* imposed, we do not find an abuse of discretion. *See United States v. Michalik*, 5 F.4th 583, 591 (5th Cir. 2021) ("[W]here a party did not act with 'an improper motive, it is rare to sanction a party in a method as draconian as suppressing the evidence.'" (quoting *United States v. Ortiz*, 213 F. App'x 312, 315 (5th Cir. 2007) (per curiam))).

### ii. *Daubert* / Rule 702

Defendants also argue that Acosta's testimony should have been excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court announced several factors courts should consider when exercising their gate-keeping function under Federal Rule of Evidence 702 and making their preliminary assessments of whether the reasoning underlying expert testimony is scientifically valid and can

properly be applied to the facts in issue. *Id.* at 592-93. These factors include: (1) whether the technique in question has been tested; (2) whether the technique has been subject to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community. *Id.* at 593-94. "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Though the proponent of the expert testimony (here, the Government) "need not satisfy each *Daubert* factor," it has the burden of showing that the testimony is reliable. *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004). This Court "reviews a district court's decision to admit expert testimony under an abuse-of-discretion standard," and, when finding abuse of discretion in admitting evidence, considers any error under the harmless error doctrine. *Hicks*, 389 F.3d at 524. We can overturn the district court's ruling only if it was "manifestly erroneous." *United States v. Kuhrt*, 788 F.3d 403, 418 (5th Cir. 2015). Additionally, it is an abuse of discretion for a district court to fail to create a record of its *Daubert* inquiry and its basis for admitting expert testimony. *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194, 201 (5th Cir. 2016).

Defendants argue that the late and deficient production by Acosta evinced a lack of standards and reliability in her methodology. The Government responds that "the lab's inability to produce a small fraction of the materials underlying Acosta's analyses in this case . . . is inconsequential to whether Acosta's methodology at the time of her analyses was scientifically valid." However, as clarified by counsel for Lewis at oral argument, even by the time of trial, the Government had failed to produce the photographs and analysis underlying two of the crimes charged in this

case. We would not characterize this oversight as inconsequential. Though it is true that district courts have broad latitude in determining the reliability of admissible evidence, they must still perform a gatekeeping function, and under certain circumstances it may be prudent for a district court to keep out scientific evidence and testimony where the methodology was so sloppy that important underlying documentation was missing. However, because defendants do not dispute that they had Acosta's conclusions and NIBIN data before the testimony, and because Acosta was not allowed to refer to the newly-produced evidence, we conclude that the district court did not make a manifestly erroneous ruling when admitting the evidence in this case.

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. In fact, Acosta admitted during cross-examination that some photographs of her analysis were lost, that there was a point during the examination of the evidence when her lab was unaccredited, and that ballistics was not a science with a mathematical degree of confidence. We have previously explained that "[t]he *Daubert* [inquiry] should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002); *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996))). "Particularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019). Thus, "[w]hile the district court must act as a gatekeeper to exclude all irrelevant and unreliable

expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Id.* (quoting FED. R. EVID. 702 advisory committee's notes (2000)). This case, too, falls into the category of cases in which the evidence was shaky but admissible, and the traditional tools of attacking the evidence were the proper means of attack. *See, e.g.*, *United States v. Barnes*, 979 F.3d 283, 307-09 (5th Cir. 2020) (observing that some of expert's testimony "may have been potentially misleading or confusing" but concluding that trial court did not abuse its discretion in allowing the testimony, especially where "counsel's effective cross-examination resolved these ambiguities and clearly demonstrated for the jury" its weaknesses); *United States v. Lee*, 966 F.3d 310, 323 (5th Cir. 2020) (noting, when conducting analysis of expert testimony, that "the defense took full advantage of the 'traditional and appropriate means of attacking shaky but admissible evidence'" and that these attacks featured in defendants' closing argument, and yet "the jury heard the defendants' impeachment evidence and voted to convict anyway"); *see also Williams v. Monitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018).

Defendants argue that Acosta's technique was not standardized because the lab was not accredited and that Acosta's conclusions were not based on the "existence and maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 594. However, we have previously explained that the proponent of expert testimony "need not satisfy each *Daubert* factor." *Hicks*, 389 F.3d at 524. For the reasons explained above, we do not find an abuse of discretion in how district court decided to admit the ballistics evidence and testimony in this case.[23]

---

[23] Defendants also argue that the Government did not show that Acosta's work was peer reviewed, citing to Hueske's declaration. However, given that Acosta testified that everything was peer reviewed, that the district court has discretion in deciding which of

No. 17-30610
c/w No. 17-30611

## D. *Batson* Challenges

Lewis argues that the trial court erred by allowing the Government to exercise peremptory strikes against two potential jurors for race-related reasons. Under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny, "parties are constitutionally prohibited from exercising peremptory challenges to strike jurors based on race, ethnicity or sex." *Rivera v. Illinois*, 556 U.S. 148, 153 (2009). "Under *Batson*, once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its peremptory strikes. The trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019). To make such a determination:

> The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties. The trial judge's assessment of the prosecutor's credibility is often important. The Court has explained that the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province. The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the

---

*Daubert*'s specific factors are measures of reliability in a particular case, *Kumho Tire*, 526 U.S. at 152-53, and that defendants had the opportunity to point to the blank peer review lines on Acosta's summary reports during their cross examination as they did in their motion to exclude her testimony, we find no abuse of discretion. *See also SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 776 (5th Cir. 2017) ("[T]he lack of . . . peer review does not necessarily render expert testimony unreliable.").

No. 17-30610
c/w No. 17-30611

basis of race. The ultimate inquiry is whether the State was
motivated in substantial part by discriminatory intent.

*Id.* at 2243-44 (cleaned up). An appeals court "looks at the same factors as
the trial judge, but is necessarily doing so on a paper record" and thus should
be "highly deferential" to the trial court's factual determinations in a *Batson*
hearing, sustaining the trial court's ruling on the issue of discriminatory
intent "unless it is clearly erroneous." *Id.* at 2244 (citation omitted).[24]

## 1. Prospective Juror 17 ("Juror 17")

Lewis first argues that the trial court erred by failing to explicitly reach
the third step of *Batson* when assessing the prosecution's peremptory
challenge striking Juror 17. However, we have previously affirmed an implicit
finding by a trial court that the Government's explanation was credible. *See
United States v. Ongaga*, 820 F.3d 152, 166-67 (5th Cir. 2016).

Lewis also argues that the Government's reason for striking Juror 17,
that she lived in a neighborhood implicated in the case and was being
untruthful about discussing crime there, was hyperbolic and based on
inferences made because of her race. During voir dire, the district court noted
that the alleged organization the defendants were a part of was described in
the indictment as "an alliance of multiple street gangs from the areas of
Gallier Street in the Upper Ninth Ward in New Orleans, and around the area
of 3rd and Galvez Street in New Orleans." The court then posed the
following question: "Have any of you. . . ever lived in the areas of Central
City, the Third Ward, the Upper Ninth Ward, Desire Projects, Florida
Projects, Calliope Projects, Front of Town or Press Park Development within

---

[24] Lewis argues that review should be *de novo* here because the trial court did not
properly reach the third step under *Batson*. We disagree, and find that the trial court
implicitly reached the third step.

No. 17-30610
c/w No. 17-30611

the City of New Orleans?" The transcript shows that Juror 17 responded by raising her hand, and then she entered into the following exchange with the court:

> Juror 17: I live up in – on – I live up the uptown. Close around Galvez.
>
> Court: You live close around Galvez?
>
> Juror 17: Uh-huh.
>
> Court: Have you discussed any incidences that might have occurred of a criminal nature in your neighborhood or in that area?
>
> Juror 17: No.

Lewis argues that this exchange shows only that Juror 17 lived on Galvez Street and that, because Galvez spans the width of New Orleans, the Government's assumption that Juror 17 lived close to Third and Galvez and thus was lying about not discussing crime in her neighborhood was based on inferences made because of her race. This argument ignores the fact that Juror 17 was responding to a general question that isolated certain neighborhoods in New Orleans. Given the broader context behind Juror 17's response, we do not find clear error. *See United States v. Turner*, 674 F.3d 420, 436 (5th Cir. 2012) ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination, but intuitive assumptions, inarticulable factors, or even hunches can all be proper bases for rejecting a potential juror, even in the *Batson* context." (cleaned up)).

### 2. Prospective Juror 13 ("Juror 13")

Lewis also argues that the prosecution's explanation for striking Juror 13, after defense's objection, was plainly pretextual. The exchange surrounding Juror 13 went as follows:

35

No. 17-30610
c/w No. 17-30611

Government: She's a postal worker married to a social worker.

Court: Go on.

Government: Social workers are inherently kind of giving and nice, you know, kind people who see the world a certain way.

Court: There's other social workers. Have you struck any others?

Government: Yes, 32.

Court: She's Caucasian?

Government: We struck the other Caucasian social worker, Number 32.

Court: I'm going to agree with you. I'm going to add one thing. I've been watching Juror Number 13 pretty closely. She has been scowling pretty much. She doesn't want to be here. I'm just making that observation because I have observed her, and I think that's appropriate. Next.

Lewis argues that Juror 13 could not have been giving and nice if the district court found that she was scowling, and he lists other jurors who "either worked in schools or in the healing professions, or had family members who did so," who were not struck. Here, given that the district court made findings on the juror's demeanor, and given that "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike," *Snyder v. Louisiana*, 552 U.S. 472, 479 (2008), we see no clear error.

### E. Confrontation Clause Challenges

#### 1. Admission of 11-107 Factual Bases

Neville argues that the admission of the factual bases of the pleas of co-defendants Lewis, Doyle, Perry and Owney was error that violated his Confrontation Clause rights. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

36

witnesses against him."). These co-defendants had pleaded guilty in Case No. 11-107, which involved conduct underlying the drug conspiracy for Count 2 of this case.[25] A redacted confession by a co-defendant may be found to violate the Sixth Amendment under the doctrine of *Bruton v. United States*, 391 U.S. 123 (1968), where the redacted confession is "facially incriminating" because it includes "statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve the inferences that a jury could make immediately, even were the confession the very first item introduced at trial." *United States v. Gibson*, 875 F.3d 179, 194 (5th Cir. 2017) (cleaned up). However, the *Bruton* doctrine does not apply "to statements that only become inculpatory 'when linked with evidence later introduced at trial,'" because "non-facially-inculpatory statements are less likely to inexorably steer a jury into disregarding limiting instructions" and also involve "the practical impossibility of predicting in advance what statements might *become* inculpatory when coupled with other evidence presented at trial." *United States v. Reed*, 908 F.3d 102, 118 (5th Cir. 2018) (citation omitted). We review constitutional challenges *de novo* and a district court's evidentiary decision on a *Bruton* issue for abuse of discretion, subject to a harmless error analysis. *United States v. Powell*, 732 F.3d 361, 376 (5th Cir. 2013).[26]

---

[25] Neville's *Bruton* arguments align with his argument—discussed *infra*—that his case should have been severed from his other co-defendants.

[26] The parties dispute the applicable standard of review. The Government argues that Neville's arguments should be reviewed for plain error because he "did not object to admission of the factual bases after the district court finished redacting them." However, given that (1) Neville premised his original objection on the argument that *any* admission of the factual bases would create Confrontation Clause issues, even were they redacted; (2) the district court emphasized that contemporaneous objections were unnecessary on issues that had already been ruled on; (3) the Government chose to focus on harmless error (rather

No. 17-30610
c/w No. 17-30611

Neville contends that the district court erred in allowing the introduction of evidence referencing his non-testifying co-defendants' prior guilty pleas in Case No. 11-107. Neville argues that the pleas were detrimental to his presumption of innocence, and "easily allowed the jury [to] put Mr. Neville right in the red-hot center of [the conspiracy]," violating the *Bruton* doctrine.

Lewis's factual basis, as redacted and shown to the jury, included Neville's address at 1809 Desire Street.[27] Neville argues that this problem was then compounded by the Perry factual basis – which described similar facts, although it redacted Neville's address itself – and further multiplied when the Government's opening and closing statements highlighted the guilty pleas.[28]

The Government concedes that the failure to redact Neville's address in Lewis's factual basis was a *Bruton* violation under *United States v. Nuttall*, 180 F.3d 182 (5th Cir. 1999). In that case, we held that the admission of a confession with a redacted name but reference to an address was error; however, the error was ultimately harmless where there was "otherwise ample evidence" against the defendant and "absent the *Bruton*-tainted

---

than the standard of review) at oral argument, we will not use the plain error standard of review.

[27] The jury heard testimony that this was Neville's address.

[28] At one point, when going through the indictment and describing Count 2, the Government went so far as to state: "That is a drug-trafficking conspiracy to deal 280 grams or more of crack and a kilo or more of heroin. You'll notice that only six of the defendants are charged in this one. That's because, as you heard throughout this case, four of them – Doyle, Perry, Evans Lewis and Terrioues Owney already pled guilty in the 11-107, the first case. So we can't charge them again, but they have already admitted that they did the conduct at issue in Count 2."

confessions," there was not "a reasonable probability that the defendant would have been acquitted." *Id.* at 188.

We conclude that Neville has shown a *Bruton* violation on these facts. When the Government re-charges offense conduct in a successive prosecution yet multiple defendants in that successive case already have pled guilty to the recharged offense conduct, the peril of a *Bruton* violation, even inadvertent, is high. District judges, unsurprisingly, will need to be attentive to redactions, limiting instructions, and possibly severance. Nevertheless, in this case we find that the *Bruton* violation was harmless.[29] "It is well established that a *Bruton* error may be considered harmless when, disregarding the co-defendant's confession, there is otherwise ample evidence against a defendant;" on the other hand, "we will find a *Bruton* error not harmless if, absent the improper evidence, there was a reasonable probability that the defendants would be acquitted." *United States v. Powell*, 732 F.3d 361, 379 (5th Cir. 2013) (cleaned up). In this case, there was ample evidence upon which the jury could have convicted Neville of the drug conspiracy. There was testimony from cooperating witness Stewart that Neville got heroin from him, and that Neville traveled to Texas, where Stewart testified 39ers members would go to pick up drugs and bring them back to New Orleans. Cooperating witness Franklin also testified that Neville sold heroin. FBI agent Christopher Soyez testified about executing a search warrant at 1809 Desire Street, and about the evidence found there: a small

---

[29] The Government notes that the jury was given instructions to disregard any redacted portions of the factual bases, and to refrain from indulging in "guesswork or in speculation" when considering the evidence. These instructions are not particularly curative. More importantly, *Bruton* itself was premised on there being a "substantial risk that the jury, *despite instructions to the contrary*, looked to the incriminating extrajudicial statements in determining petitioner's guilt." *Bruton v. United States*, 391 U.S. 123, 126 (1968) (emphasis added).

bag of suspected heroin, drug paraphernalia, documents in the name of Franklin and Lewis; and other paperwork with Neville's name and street address. Thus, on review of the record, "we are convinced beyond a reasonable doubt that the prosecution's error, though legally inexcusable, was harmless in light of the other evidence presented at trial." *Powell*, 732 F.3d at 380.

### 2. Questioning of Sergeant Melanie Dillon

Neville raises several objections to the prosecution's questioning of Sergeant Melanie Dillon ("Dillon"). Neville argues that "the Government intentionally examined Sgt. Dillon in such a manner that the Government repeatedly elicited hearsay statements that, in many instances, violated [Neville's] Confrontation Clause rights under the Sixth Amendment." The Confrontation Clause generally bars witnesses from testifying about out-of-court statements given by non-testifying individuals. *Crawford v. Washington*, 541 U.S. 36, 53-56 (2004); *see also Hemphill v. New York*, 142 S. Ct. 681, 694 (2022) ("The Confrontation Clause requires that the reliability and veracity of the evidence against a criminal defendant be tested by cross-examination, not determined by a trial court."). We have noted the "recurring problem" of "[b]ackdooring highly inculpatory hearsay via an explaining-the-investigation rationale" and have warned that "the government must take care to avoid eliciting" this unconstitutional testimony. *United States v. Sharp*, 6 F.4th 573, 582 (5th Cir. 2021). Neville identifies 16 excerpts of the prosecution's examination of Dillon that he contends "demonstrate that the prosecutor methodically sought to elicit inadmissible hearsay evidence from the witness." Confrontation Clause objections that were properly raised at trial are reviewed *de novo*, subject to harmless error analysis; where objections to the disputed evidence were not properly raised at trial, review is for plain error. *See United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007). An error

No. 17-30610
c/w No. 17-30611

or defect is plain if it was clear or obvious and affected the defendant's substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

The Government called Dillon as a witness to events on April 12, 2010 relating to an alleged shootout between the 39ers and a rival gang. At the beginning of Dillon's testimony, counsel for defendants objected out of anticipation that the prosecution would try to elicit testimony based on hearsay and information Dillon did not have first-hand knowledge of—such as a gang retaliation motive behind the shootings. The district court noted the objection, agreeing that "[s]he can't speculate but she certainly can give her observations and what her investigation revealed." The court also agreed that it would be hearsay for Dillon to say "the FBI agent told me such and such," stating "I am not going to allow that but we haven't heard that yet." The Government then examined Dillon, and counsel for defendants lodged various contemporaneous objections.

We focus on four exchanges where the hearsay objections were salient.[30] First, Neville argues that his objection should not have been overruled when Dillon testified that she determined, in her investigation, that Jesse Terry was murdered in retaliation for the murder of Quelton Broussard. Neville's argument is not developed enough to confirm that hearsay was heard; the objection was one of speculation implicating Dillon's personal knowledge or causing confusion as to the foundation of her knowledge. *See* FED. R. EVID. 602, 403. Second, Neville argues that Dillon's testimony about Darick Wallace was improper.[31] However, the exchange itself appears to

---

[30] For the remaining exchanges that Neville identifies, we either see no potential issue with the district court's handling of the objections or cannot say that Neville has shown plain error where he failed to make contemporaneous objections.

[31] The relevant exchange went as follows:

relate to Dillon's impression that Wallace was not cooperative. The single sentence the district court permitted did not prejudice Neville. Third, Neville argues that Dillon improperly testified about casings found on the crime scene of the third shooting when her testimony was based on the ballistics report. However, having examined the record we conclude that the exchange emphasized that her testimony was based on her observations, to the best of her knowledge. The primary objections appeared to be concerns about the chain of custody, and these objections did eventually lead to a ruling from the district court sustaining the objection and telling the prosecution they would have to bring in the person whose initials were on the casings exhibit.

Fourth, Neville argues that the following exchange constituted hearsay:

Q. Did you ask any questions of Mr. Curry while he was being interviewed?

---

Q. . . . [D]id you have the opportunity to interview Darick Wallace?

A. Yes.

Q. Okay. Was Mr. Wallace cooperative?

A. No.

Q. And how is it that you can tell us he was not cooperative?

A. In his statement to me he said that he slumped down and he didn't –

Counsel for Neville: Objection, your Honor, hearsay.

The Court: Overruled.

Q. You can testify to that.

A. He slumped down and he didn't see the car that was shooting at them or neither did anyone from his car shoot.

No. 17-30610
c/w No. 17-30611

A. I believe the question was asked about his friend Quelton Broussard.

Q. Okay. And what did you observe as far as Mr. Curry's demeanor when he was asked about his friend Quelton Broussard?

A. He was visibly upset. He said they were lifelong friends and he was hurt –

[Defense Counsel]: Judge, I would object, this is a hearsay statement of Mr. Curry.

[The Court]: Overruled.

The Witness: He was hurt by the death of his friend.

Q. All right. Was he emotional during this interview?

A. Yes.

Q. And how do you know, what did you observe as far as him being emotional?

A. He may have become teary-eyed or so.

Neville objects to this testimony as hearsay. Neville argues that the statements "establish a connection between Lloyd Curry and Quelton Broussard thus suggesting that the shootings were retaliatory." Importantly, Neville does not dispute that Curry was killed. Nor is the testimony from Dillon hearsay in so far that it is based on her observations of Curry's demeanor and teary eyes. The only objectionable phrases, then, are Dillon's recounting of Curry's statements that "they were lifelong friends" and "he was hurt by the death of his friend."

Because of the prosecution's method of questioning Dillon, Neville asks that we reverse his conviction for the RICO conspiracy in Count 1 and the firearms conspiracy in Count 3. However, we review objected-to Confrontation Clause violations and errors in the admission of hearsay evidence for harmless error, *United States v. Kizzee*, 877 F.3d 650, 661 (5th

43

Cir. 2017), and we conclude that any potential error was harmless here. As discussed above, we only see two arguable hearsay violations—if there were other violations, they were so minimal that "there is [no] reasonable possibility that the evidence complained of might have contributed to the conviction." *Kizzee*, 877 F.3d at 661 (alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Though the shootings at issue in Dillon's testimony were charged as overt acts of the RICO conspiracy,[32] they were only tangentially related to Neville's involvement in the conspiracy and, taking this evidence out of the equation, the prosecution had ample evidence that there was a conspiracy under Counts 1 and 3 and that Neville was involved in both.

Finally, Neville argues that the questioning by the prosecutor, when taken together as a whole, amounted to prosecutorial misconduct. He contends that the prosecution's case purposefully relied on eliciting backdoor hearsay testimony. In making this argument, he analogizes his case to *United States v. Johnston*, 127 F.3d 380 (5th Cir. 1997). Yet *Johnston* is distinguishable from this case. In *Johnston*, prosecutors repeatedly responded to sustained hearsay objections by asking law enforcement officers whether conversations with witnesses resulted in the narrowing of investigations to specific appellants. *Id.* at 394-96. Moreover, Neville himself admits that *Johnston* addressed "only those instances where an appellant is directly implicated" and that the same is not true in this case. *Johnston*, 127 F.3d at 394. The questioning in this case was not prosecutorial misconduct under *Johnston*.

---

[32] The shootings described by Dillon were not themselves charged as separate counts (outside of their inclusion as overt acts of the RICO conspiracy)—rather, they were used as a way to explain the feud that later led to deaths that were charged in this case.

No. 17-30610
c/w No. 17-30611

F. Jury Instructions Challenges

1. Denial of Requested Instructions

Lewis argues that the district court should not have refused to provide three of his suggested jury instructions. We ordinarily review a district court's refusal to provide a requested jury instruction for abuse of discretion. *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011); *United States v. Salazar*, 751 F.3d 326, 330 (5th Cir. 2014). "A refusal to give a requested instruction constitutes reversible error only if the proposed instruction (1) is substantially correct, (2) is not substantively covered in the jury charge, and (3) pertains to an important issue in the trial, such that failure to give it seriously impairs the presentation of an effective defense." *United States v. Webster*, 162 F.3d 308, 322 (5th Cir. 1998).

i. Denial of Count 1 Special Allegations Instructions and Verdict Forms

Lewis argues that it was error for the trial court to deny his "requested instructions and verdict form language . . . requiring that the jury find that the homicides enumerated in the special allegations were a 'part of' or 'during and in furtherance of the RICO conspiracy.'" Because all defendants whom the jury found to have committed the murders in the Count 1 interrogatories were also convicted for VICAR murders involving the same victims, the jury connected the murders to the racketeering enterprise.

ii. Denial of Falsus in Uno, Falsus in Omnibus Instructions

Lewis also argues that the district court erred in denying his *falsus in uno, falsus in omnibus* instruction, which would have provided that jurors are entitled to disregard a witness's testimony altogether if they determine that he has testified falsely on any matter. However, we find that the jury instructions as given substantially covered this instruction, because they sufficiently advised the jury to discredit any witness they believed to be lying.

45

### iii. Denial of Partial Verdict Instruction

Finally, Lewis argues that the district court should have granted his request for a partial verdict instruction, one that would have directed the jury that it could (1) return a verdict at any time during the deliberations as to any defendant about whom it had agreed and (2) return a verdict on any counts on which it had agreed even if it had not yet agreed to a verdict on all counts. Lewis initially requested this instruction in his objections to the Government's proposed jury instructions; he then renewed it in conference on day 23 of the trial. The trial court denied the instruction both times. However, the jury was instructed not to change positions to reach a verdict in the following manner:

> During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced you were wrong; but do not give up your honest beliefs as to the weight of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.

During jury deliberation, the jury sent out two questions. Question one, sent out the first day of deliberations, was written as follows: "How do we proceed when we cannot come to an unanimous decision on the murder charge?" The court responded: "You have only been deliberating for a short period of time. We all appreciate how seriously you are considering this case and all of the evidence. I am going to ask that you continue your deliberations in an effort to agree on a unanimous verdict in addressing this count." Lewis again requested the partial verdict instruction, but the trial court again denied it, finding that it was premature because he did not want the jury to think that he was rushing them.

The jury's second question was: "We have been deadlocked on one murder conviction for one defendant since the beginning of deliberations. We have exhausted all notes and resources and still have Jurors steadfast on

No. 17-30610
c/w No. 17-30611

opposite verdicts. We have put this one aside [and] finished all of the others, came back to it and still cannot make progress. Please Advise." However, the district court was not able to give Lewis' requested instruction at that time because, as the court explained in a later order:

> The Court anticipated that Lewis was going to re-urge his request for the instruction when the jury indicated once again on the last day of deliberations that it remained deadlocked on one of the murders but before the Court could reconvene with counsel the jury reached a verdict. The delay in reconvening with counsel was due solely to the logistics of the lunch hour, during which the jury had continued its deliberations, and the tracking down of all counsel in the case. It is rank speculation to posit that the jurors interpreted the lunchtime delay in answering their question as an indication that the Court was going to dismiss their concerns and force them into a verdict. Moreover, the jury may not have been struggling over the Littlejohn Haynes murder; it could just as easily have been Alonzo Peters' participation in the murder of Kendall Faibvre. The jury acquitted Peters of that murder.

We find no reversible error here. The jury was properly instructed not to change positions solely to reach a verdict, and, though a partial verdict instruction might have been warranted after the second question, we are persuaded that the slight delay in answer did not force the jury into a verdict or change the nature of deliberations.

## 2. Objections to Jury Instructions

Normally, "we review a jury instruction for abuse of discretion, affording substantial latitude to the district court in describing the law to the jury." *United States v. Williams*, 610 F.3d 271, 285 (5th Cir. 2010). We consider "whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *Id.*

47

No. 17-30610
c/w No. 17-30611

Lewis now raises one objection[33] to the jury instructions: that, read together, the combination of the aiding and abetting and the Louisiana principal instructions became "incomprehensible." He claims this is so because the instructions for the VICAR homicide count referenced principals, the district court provided the liberal definition of principals under Louisiana law, and the district court provided the aiding and abetting instruction with respect to the VICAR homicides that also mentioned the intent of the principal. Having reviewed the instructions, however, we hold that the Louisiana law of principals was clearly provided only as to the fourth element of the VICAR count. The law was described to the jury in a clear, comprehensible manner.

## G. Walker's Motion for Mistrial

Walker argues that the district court erred in denying his motion for mistrial "following the solicitation of prejudicial information by co-defendant counsel." "We review the denial of a motion for mistrial founded on the admission of prejudicial evidence for abuse of discretion." *United States v. Richardson*, 781 F.3d 237, 246 (5th Cir. 2015). Under this standard, "a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record" and we give "great weight to the trial court's assessment of the prejudicial effect of the evidence." *Id.* (citation omitted). Additionally, we must "examine the context of the disputed statement to ascertain its source—namely, whether it was elicited by the Government or spontaneously volunteered by the witness." *Id.*

---

[33] We need not reach any objection to the § 924 charges because, for the reasons set forth below, we vacate them as they pertain to Lewis.

No. 17-30610
c/w No. 17-30611

The disputed statement at issue here was elicited by counsel for Ashton Price during his cross-examination of the Government's cooperating witness Franklin. During the questioning, counsel disclosed that all defendants were in jail.[34] Several defendants moved for mistrial after the cross-examination, arguing that the jury should not have been informed that the defendants were incarcerated, especially since the court and parties had intentionally concealed the defendants' incarcerated status. During the bench conference, the trial judge stated that he saw "absolutely no prejudice at all to the defendants," given the nature of the disclosure. In fact, the trial court observed that, "quite candidly, if there was any misleading, it might

---

[34] The testimony went as follows:

Q. You're wearing an orange jumpsuit today, right?

A. Yes, sir.

Q. You have shackles on your legs, right?

A. Yes, sir.

Q. You have a belt that goes around your waist to where your hands can be secured, right?

A. Yes, sir.

Q. Do you see anybody else in the courtroom dressed like that?

A. I'm the only one.

Q. You're the only one. Why do you think that is?

A. Because I'm in jail.

Q. Yeah. My client is in jail. He's not dressed like that, is he?

A. No, sir.

Q. All these other men, they are not dressed like that, are they?

A. No, sir.

Q. Do you think maybe the only person in here right now the Government is afraid might try to do something crazy is you?

A. I don't know. I'm the rat. Shit, they'll do something to me.

have been to the benefit of the defendants that the Government did not get up there and object and want me to set the record straight," and thus, "if there is any prejudice – and there is none – I would say it would be more against the Government than against any defendant." The court also ruled that the Government "will not be allowed, under redirect, to go into the fact that any defendant is in jail. The Government will not be allowed under redirect to say that the defendants are shackled at the legs or anything like that. Okay. I'm not going to allow that."

Giving great weight to the district court's assessment of the lack of prejudicial effect, and having read the record ourselves, we hold that the denial of the motion for mistrial was not an abuse of discretion.

## H. Government's Closing Arguments

Neville argues that several statements made in the prosecution's closing argument constitute reversible error. Both parties agree that the statements were not objected to at trial, and thus we review for plain error. *See United States v. Aquilar*, 645 F.3d 319, 323 (5th Cir. 2011). We hold that none of the statements made during closing rose to the level of plain error, and we address Neville's three main objections in more detail below.

First, Neville argues that the Government improperly invited the jurors to rely on their confidence in the integrity of the Government and their loyalty to their country in convicting the defendants. Neville analogizes this case to the facts in *United States v. Goff*, 847 F.2d 149 (5th Cir. 1988). However, *Goff* involved a prosecutor who both invoked his personal status as the Government's attorney and "suggested that in order to find appellants not guilty, the jury would have to believe that several governmental agencies and even perhaps federal judges had engaged in a malevolent and illegal conspiracy to convict them." *Id.* at 164. The record shows that the statements made by the prosecution in this case are distinguishable from

50

those made in *Goff*. The statements at issue here were made in response to defense arguments that the cooperating witness testimony should be discounted, and they describe the Government's case strategy.[35] The statements do not go so far as to "invoke jurors' loyalty to their country or its government as a reason for convicting the accused," *id.*, and thus are not error under *Goff*.

Next, Neville argues that the Government improperly commented on the defendants' exercise of their Fifth Amendment right to remain silent when making the following statement:

> Did Gregory Stewart plead guilty after Darryl Franklin started cooperating? Yes. Did Washington McCaskill start cooperating after those two men pleaded guilty? Yes. Did Tyrone Knockum come in after those three men? Yes. Did Rico Jackson come in after them? Yes. Did all these men plead to sentences that had mandatory life, they're doing life or facing a potential life sentence? Yes.
>
> You can also play another game when you get back in the jury room. You could think, well, what if Rico didn't cooperate? What if he wanted his shot at the government? I suspect that the testimony or the argument would sound a lot the same. There would be 11 defendants saying four men were liars. You could flip it the other way. What if one of these people had

---

[35] The main statements objected to by Neville include a comment that the Government "got involved [in investigating the 39ers] and we decided that we wanted to be the ones to make these neighborhoods safe again, make this an area where you can come and feel happy to be here and feel that your life is not in danger and that is exactly what we did," and a remark that: "But in this case this cooperation engineered by the FBI and the U.S. attorneys has done positive things like free innocent men out of jail. And the defense is arguing that we should reject that information. What kind of perverted criminal justice system would that be? I submit that our system is superior to not taking the information, getting the criminals to actually tell you who they were doing the crimes with."

No. 17-30610
c/w No. 17-30611

come in and testified? I submit it would be nine people calling six cooperating witnesses liars.

Taken in context, this argument is not one that was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Cervantes*, 706 F.3d 603, 614 (5th Cir. 2013) (citation omitted). Though it is true that the words "testimony" and "testified" are used, the overall point made to the jury is that the defense was attempting to discredit the cooperators because doing so was in their best interest. The jury would not take this statement to be a comment on the failure of the accused to testify, but rather as a comment on the nature of cooperating witnesses.

Finally, Neville argues that the prosecutor encouraged the jury to disregard the jury instructions when, in responding to arguments made by counsel for defendants, the prosecutor argued: "There's a lot of talk, 'Oh, you know, they're going to get a Rule 35, they're convicted, it will be worse,' whatever. As jurors, y'all don't have to worry about the Rule 35. It is not contingent on any result, and your verdict shouldn't be predicated on what you may think happens with that process." Neville argues that this argument encouraged the jury to disregard their Rule 35 instruction.[36] However, the

---

[36] The instruction read as follows:

You have heard evidence that various witnesses hope to receive a reduced sentence in return for their cooperation with the government. All are subject to lengthy sentences. They have entered into plea agreements with the government which provide that if the prosecutor handling these witnesses' cases believes that they have provided substantial assistance in this case, he can file in this court a motion to reduce the sentences. A judge has no power to reduce a sentence for substantial assistance unless the U.S. attorney files such a motion. If such a motion is filed then it is entirely up to the judge to decide whether to reduce the sentence at all, and if so, how much to reduce it.

prosecution's argument does not encourage the jury to ignore the cooperating witnesses' self-interest in testifying—rather, it counters arguments made by defendants and urges the jury not to speculate as to whether, should they convict those they believe to be guilty, they would be allowing others, who might be dangerous to society, to walk free. We conclude that there was no plain error.

## I. Challenges to § 924 Convictions

Defendants Lewis, Owney, Perry, Ashton Price, Leroy Price, Walker, Neville, Peters and Barnes challenge their convictions under 18 U.S.C. § 924(c), (j), and (o), all of which apply to cases where a firearm is used during or in furtherance of a crime of violence or drug trafficking crime.[37] Defendants argued that inclusion of the RICO conspiracy as a predicate crime of violence invalidated their convictions under this Court's precedent. In its original brief, the Government disputed this claim, arguing that the "aggravated form of RICO conspiracy" at issue in this case qualified as a crime of violence. Subsequently, in a 28(j) letter filed on August 17, 2021, the Government acknowledged that a recent case, *United States v. McClaren*, 13 F.4th 386, 412-14 (5th Cir. 2021), foreclosed their argument that aggravated RICO conspiracies could constitute crimes of violence. The Government preserved the argument but submitted the case on the alternative harmless-error argument set forth in their brief. Six days before

---

The testimony of a witness who provides evidence against a defendant for personal advantage, such as the possibility of a reduced sentence, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the witness's testimony has been affected by self interest, or by prejudice against the defendant.

[37] Defendant Doyle was not convicted of any § 924 charges.

No. 17-30610
c/w No. 17-30611

oral argument, the Government submitted yet another 28(j) letter, declining to further press the harmless-error argument.[38]

At trial in this case, over defense objection, the district court instructed the jury that the defendants could be found guilty only if the jury unanimously found that the prosecution had proved beyond a reasonable doubt that the defendants had used or carried a firearm in relation to a crime of violence charged in Count 1 (RICO) *or* Count 2 (drug trafficking). Our opinion in *McClaren*, however, forecloses the possibility that Count 1 could be considered a crime of violence. 13 F.4th at 412-14. We thus confront the same situation as that in *Jones II*: one in which "the jury could have convicted on the § 924 counts by relying on either the invalid crime of violence predicate or the alternative drug trafficking predicate." *Jones II*, 935 F.3d at 272.

Applying *Jones II*, and relying on the Government's relinquishment of its harmless-error argument, we vacate and remand almost all of the convictions for § 924 offenses, concluding that it was plain error for the district court to permit the jury to convict based on a RICO conspiracy as a crime of violence predicate. *See id.* at 274. We do so because "[a] reasonable probability remains that the jury relied upon RICO conduct separate from the drug conspiracy . . . to convict Appellants of the challenged § 924 offenses." *Id.* at 273.

---

[38] Specifically, the Government wrote that it had "reevaluated" the harmlessness argument in preparation for oral argument, and had "determined to no longer press the argument" but rather "respectfully requests to withdraw" it. Given this relinquishment, we do not conduct an analysis of harmlessness in this case. However, nothing in this opinion forecloses the Government from arguing its alternative theory of harmless error in other cases. *See Skilling v. United States*, 561 U.S. 358, 414 (2010). *Compare United States v. Jones*, 935 F.3d 266, 273-74 (5th Cir. 2019) (hereinafter "*Jones II*"), *with United States v. Vasquez*, 672 F. App'x 56, 61 (2d Cir. 2016) (summary order).

No. 17-30610
c/w No. 17-30611

However, we do not vacate Neville's conviction under Count 44. Neville does not ask that Count 44 be vacated, and there would be no reason to vacate because the instructions for that charge were given separately and were premised only on possession of a firearm in furtherance of a drug-trafficking crime.[39]

## J. Severance

Defendants Lewis, Neville, and Owney all moved for severance before and during trial. They all raise the issue before us on appeal. Under Federal Rule of Criminal Procedure 14(a): "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." "We review a denial of a motion to sever a trial under the exceedingly deferential abuse of discretion standard." *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (internal quotation marks and citation omitted). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993)). "In many instances, prejudice from failure to sever counts can be cured through an appropriate jury instruction, and we have noted that juries are presumed to follow such instructions." *United States v. Turner*, 674 F.3d 420, 429-30 (5th Cir. 2012).

"There is a preference in the federal system for joint trials of defendants who are indicted together, particularly in conspiracy cases," and,

---

[39] The Government correctly conceded during oral argument that the sentence for Count 44 may no longer be considered consecutive to the other § 924 charges once they are vacated for Neville. Accordingly, we vacate Neville's 300-month consecutive sentence for Count 44.

thus, "a severance is reversible only on a showing of specific compelling prejudice." *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007) (cleaned up). To make such a showing, a defendant must "isolate events occurring in the course of the trial," "demonstrate that such events caused substantial prejudice" and "also show that the district court's instructions to the jury did not adequately protect him . . . from any prejudice resulting from the joint trial." *Chapman*, 851 F.3d at 379 (internal quotation marks and citations omitted); *see also McClaren*, 13 F.4th at 398. "Merely alleging a 'spillover effect' – whereby the jury imputes the defendant's guilt based on evidence presented against his co-defendants – 'is an insufficient predicate for a motion to sever.'" *Chapman*, 851 F.3d at 379-80 (quoting *United States v. Snarr*, 704 F.3d 368, 397 (5th Cir. 2013)). Nor is it sufficient for a defendant to allege they were less involved than other defendants. *See McClaren*, 13 F.4th at 398 ("While McClaren and Fortia correctly point out that their involvement was significantly less than the other defendants, the court did not abuse its discretion in denying the motion to sever.").

### 1. Owney

Owney cites to several occurrences during trial that he believes prejudiced him. We do not find that any of them rises to a showing of specific compelling prejudice. Owney points to the rap videos introduced at trial as well as the cross-examination of cooperating witness Knockum, but the district court gave limiting instructions to the jury regarding both instances. Owney does not fully explain why those instructions were not curative. Nor does Owney address how the cross-examination of Agent Wood, or the letter written by Jamal Holmes, caused substantial prejudice to him. Accordingly, we do not find that the trial court abused its discretion in denying Owney's motion to sever.

No. 17-30610
c/w No. 17-30611

## 2. Neville

Neville identifies several points that he argues demonstrate that his case warranted severance. First, Neville argues that his motion to sever should have been granted because the guilty pleas of co-defendants Perry, Lewis, Doyle, and Owney in Case No. 11-107, which involved conduct underlying the drug conspiracy in Count 2 of this case, meant that those defendants "would frequently concede the existence of a drug conspiracy throughout the trial, to the detriment of [Neville's] presumption of innocence." Neville points to specific places in the record where he contends that his co-counsel elicited testimony that the jury would not have heard if his trial had been severed.[40] However, none of the examples cited to by Neville rises to a showing of specific compelling prejudice. Accordingly, we hold that the district court's decision not to grant Neville's motion to sever on this issue is not reversible.

Second, Neville argues that the admission of the rap videos prejudiced him because codefendants Walker, Leroy Price and Perry emphasized the fact that they had *not* appeared in the videos in their opening and closing arguments. We do not find that the statements made by his co-defendants' counsel rose to the level of substantial prejudice.

Next, Neville points to three occurrences at trial that he believes prejudiced him. First, he contends that cooperating witness Franklin gave testimony that implicated him. Franklin did begin to connect Neville to guns, but the district court immediately called for a bench conference and, following the conference, gave a curative instruction. Second, Neville argues

---

[40] For example, counsel for defendant Perry once elicited testimony from cooperating witness Franklin about the magnitude of heroin dealing conducted by Franklin. We note that we addressed the *Bruton* challenge to the admission of the guilty pleas at *supra* Part II.E.1.

that a chart initially created by Stewart's lawyer was shown to the jury and prejudiced him. This chart was in front of the jury for approximately ten minutes, and it was followed by a limiting jury instruction.[41] Because Neville does not convincingly explain why the curative instructions given after both instances did not adequately protect him from any resulting prejudice, we find no abuse of discretion.

The third occurrence that Neville believes prejudiced him involved testimony from cooperating witness Stewart that implicated Neville in the Faibvre murder. Though Neville was not charged in that murder, he argues that the testimony created spillover into the counts where he was charged. Given that the jury was not only immediately told to strike that statement but was also instructed that "the fact that you may find a defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other," we find that this instance does not rise to a showing of specific compelling prejudice.

### 3. Lewis

Lewis argues that the district court abused its discretion in denying his motion for severance after the admission of shocking crime scene photographs, particularly those that related to the Marshall homicide that occurred after he was in custody. Lewis contends he was prejudiced when he was convicted "against the weight of the evidence" as to the Littlejohn Haynes murder. However, Lewis was also acquitted on several counts, an indication that the jury gave each defendant and count consideration. *See*

---

[41] The instruction went as follows: "Ladies and gentlemen of the jury, that document that was on the screen is not admitted into evidence. So the sole reason for Mr. Miller to have used this was on specific items he referred to . . . . You are to disregard everything else that was on that document, and that should not enter into any of your deliberations or any of your decisions. Okay?"

*United States v. Stalnaker*, 571 F.3d 428, 435 (5th Cir. 2009) ("[T]he jury found Stalnaker not guilty on two counts on which it found his co-defendants guilty. That suggests that the jury did not blindly convict Stalnaker on spillover evidence but instead gave each count separate consideration."). Furthermore, to show that the district court abused its discretion, Lewis must argue more than "spillover effect." *Chapman*, 851 F.3d at 379. Lewis analogizes his case to *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012), but in that case this Court found that limiting instructions could not cure the prejudice in particular because of:

> (1) the marginal relationship between the charge and the evidence against Warren and that against his co-defendants; (2) the significant difference between the simpleness of the underlying charges—essentially use of excessive force—against Warren, in the performance of his duty as a police officer, and the crimes alleged against his codefendants involving dishonesty, corruption, obstruction and cover-up; (3) the highly inflammatory and prejudicial nature of the charges and evidence against the co-defendants, from which Warren was disassociated, involving the burning of Glover's body in Tanner's car, the racially motivated beating of Tanner and King; and the alleged alteration and distortion of a police investigative report[.]

*Id.* at 828. Lewis has not shown this level of prejudice, and we find no abuse of discretion.

## K. *Brady* Violations

### 1. McCaskill Letter

After trial, an attorney for a defendant in the related state RICO prosecution provided one of the federal defendants' counsel with an undated letter from cooperating witness McCaskill to Orleans Parish Assistant District Attorney Alex Calenda ("the McCaskill letter") that stated:

> Our federal case is all made up lies[.] Darryl Franklin and Rabbit lied about a lot of things[.] You think anyone care[.] No because their prejudice toward us.

All defendants moved for a new trial based on the McCaskill letter. The district court denied the motions, holding that the letter was not material. During its analysis, the district court highlighted that Franklin and Stewart had been "inexorably impeached" during cross-examination, where they "parried a multitude of impeachment evidence, including evidence that suggested that those witnesses were less than truthful at times."

We review motions for a new trial based on an alleged *Brady* violation *de novo*, "while acknowledging that we must proceed with deference to the factual findings underlying the district court's decision." *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004); *see also United States v. Severns*, 559 F.3d 274, 278 (5th Cir. 2009). In this context, the Court applies the three-prong *Brady* test to determine whether a new trial is appropriate. *Severns*, 559 F.3d at 278. "[T]he defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to [the defendant]; and (3) the evidence was material either to guilt or punishment." *Id.*

Evidence is material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is established when the failure to disclose the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Although evidence is generally not material "when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," *Felder v. Johnson*, 180 F.3d 206, 213 (5th Cir. 1999) (quoting

*United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996)), this Court has found suppressed impeachment evidence to be material when "it change[d] the tenor" of the witness's testimony, even though the witness had already been impeached on other grounds. *Sipe*, 388 F.3d at 489.

Here, the defendants contend that impeachment of the cooperating witnesses was a main focus of the defendants' case and that the McCaskill letter was the strongest evidence that those witnesses were lying. More specifically, Barnes argues that the McCaskill letter is material because it was "the *only* admission that any of the cooperators had fabricated charges *in this case.*" Barnes points out that both Stewart and Franklin insisted that they were telling the truth this time.

It is true that defense counsel highlighted the lack of credibility of the cooperating witnesses throughout trial. McCaskill was impeached based on evidence that he had lied to law enforcement when he accused Kevin Jackson, a defendant in another federal case, of selling heroin to McCaskill. He was also impeached through phone calls in which McCaskill, speaking to various friends and family, accused Franklin and Stewart of lying about two of the murders charged in this case, and generally about the case as a whole. In one call, McCaskill told his son's mother that Stewart lied about Jasmine Perry's involvement in two murders. In another, McCaskill said, referring to Stewart and Franklin: "They're all lying."

The defendants also impeached Franklin and Stewart extensively with evidence that both had lied to law enforcement and to friends and family about their own actions and their own willingness to cooperate, as well as with evidence of benefits granted to the witnesses in exchange for their testimony. For example, the jury heard phone calls in which Stewart lied to law enforcement while setting up his cooperation. Stewart himself explained to the jury that he had been lying in those calls: "Yeah, I lied to him, I am

lying to him." Stewart also said, "I was telling the truth at first, then I started lying," and he further said, "I decide to try to play games with the government because I was trying to go my way as I wanted them to do what I wanted them to do. But look at what happened, they got the ups on me. So I had to lay down and sign the deal." The jury also heard about other specific lies. Stewart testified that he had lied to law enforcement about his involvement in the murder of Gregory Keys, and admitted that he lied about killing Renetta Lowe.[42] For his part, Franklin admitted that he had lied under oath in federal court in a different case, that he entered his plea agreement in this case under false pretenses and lied when doing so, and he lied in order to get the prosecution to drop a specific charge against him.

The defendants' closing arguments intensely focused on evidence that the cooperating witnesses, including McCaskill, were not credible based on their history of lying. For example, counsel for Barnes argued that when one "listens to Franklin and Stewart on the witness stand," "words no longer mean what they're supposed to mean when they debate over the twists and the meanings of different words," and noted that McCaskill "said something to the effect of '[Stewart] dug a hole and pushed everybody into it.'" Counsel for Barnes also isolated specific quotes from Franklin and Stewart and said, "if that's what they say here on the witness stand after they've been through countless interviews with the FBI and the U.S. Attorney's Office, you can imagine what led them to this point — what lies, what deceit, what manipulations, what falsities got them to this particular point." Counsel for Lewis analogized the Government's deal with cooperating witnesses Stewart and Franklin to a deal with the devil, saying: "I would not rely on them and I

---

[42] At one point, when asked whether he knew the difference between the truth and a lie, Stewart answered: "Listen, I got opinions. So whatever I say if I feel it though this is what it is, that's what it is."

don't think you can either. The government might be willing to make a deal with that devil, but you ought not." Counsel for Owney argued that the Government's case was "based upon bad information provided by bad informants" and continued: "[t]he government's dream team of cooperating criminal witnesses consist of Darryl Franklin, Gregory Stewart, Rico Jackson and Tyrone Knockum. The government's star witnesses are not credible. They all have something to gain." In fact, as counsel for Owney succinctly stated: "Darryl Franklin is a bad informant because he has lied under oath about a murder. It doesn't get much worse than that."[43]

We conclude that the McCaskill letter was favorable to the defense. However, given the already extensive impeachment of the government witnesses,[44] the overwhelming evidence of guilt, and the trial court's instruction that testimony from witnesses who had entered into plea agreements with the Government "is always to be received with caution and weighed with great care." we hold that the belatedly disclosed impeachment material does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see also United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required . . . when the suppressed impeachment

---

[43] We do not overlook that the Government responded to these arguments not simply by saying that the cooperating witnesses indeed had pleaded guilty to horrific crimes, and were seeking leniency, and had manifest credibility problems, but also argued, "Now the defense has also listened to thousands of calls and they played you a few dozen. I would submit to you none of them catch the witnesses saying, 'Oh, I fabricated this giant indictment against these defendants.'" This last remark makes our harmlessness determination a close one, but on searching review of the full record, we nevertheless conclude that impeachment of these cooperating witnesses was devastating and the missing McCaskill letter does not undermine confidence in the verdict.

[44] Impeachment of McCaskill was unrestricted and his cross-examination spanned almost 300 pages of the trial record; of Stewart, almost 700 pages; and of Franklin, nearly 500 pages.

evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."). Cooperating witnesses McCaskill, Stewart, and Franklin were extensively impeached as liars in front of the jury. Talented defense counsel argued that, even with the overwhelming impeachment they achieved, harmlessness remains close. *See United States v. Wilson*, 481 F.3d 475, 480-82 (7th Cir. 2007). But we cannot conclude that disclosure of the letter would have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. We, therefore, do not reach the question of whether it was suppressed.

### 2. *Brady* Material Received During Trial

Defendants also argue that evidence concerning the Government's commitment to file a Rule 35 motion for cooperating witness Stewart as well as information regarding the non-prosecution of the sister of cooperating witness Franklin was effectively suppressed by the Government due to its late disclosure. The district court found that the disclosure of the items during trial, either in isolation or cumulatively, did not prejudice defendants.

We agree. Though the documents should have been disclosed earlier, they were disclosed with enough time for defendants to put the information "to effective use at trial." *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985). Once the document relating to Stewart was brought to the attention of the trial court, the court adjourned from Thursday until Monday to give counsel time to analyze it. Defense counsel were then able to question Stewart about the document. As for Franklin, the district court noted that defense counsel was free to recall him to the stand to pursue the matter further, and in fact Franklin had already been confronted with the non-prosecution of his sister in front of the jury.

No. 17-30610
c/w No. 17-30611

## L. Doyle's Plea Agreement

Doyle was initially charged with four counts in this case: (1) RICO conspiracy, (2) conspiracy to use firearms to further drug trafficking crimes and crimes of violence, (3) murder in aid of racketeering, and (4) murder through the use of a firearm. However, the jury only found him guilty of one: the RICO conspiracy (Count One). His appeal revolves primarily around his plea agreement in Case No. 11-107, in which he pled guilty to conspiracy to distribute and possess with intent to distribute 10 grams or more of heroin, in exchange for an agreement with the Government. The relevant language of his initial plea agreement states:

> The Government also agrees not to charge the defendant with any other drug trafficking crimes that he may have committed in the Eastern District of Louisiana prior to July 28, 2011, as long as the defendant has truthfully informed federal agents of the full details of those crimes. The defendant understands that this agreement does not apply to crimes of violence which the defendant may have committed.

Doyle argues that his immunity agreement should have prevented him from conviction in this case, and asks this Court to "enter a judgment vacating this conviction without having to go back to the district court." To determine whether the plea agreement barred Doyle's prosecution or conviction for RICO conspiracy in the instant case, we must decide whether the RICO conspiracy charge is a drug trafficking crime.[45]

"We review *de novo* whether the Government breached a plea agreement, accepting the district court's factual findings unless clearly erroneous." *United States v. Farias*, 469 F.3d 393, 397 (5th Cir. 2006).

---

[45] Because we conclude that the RICO conspiracy charge was not a drug trafficking crime, we do not reach the question of whether Doyle breached the plea agreement.

No. 17-30610
c/w No. 17-30611

"Nonprosecution agreements, like plea bargains, are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). "In determining whether the terms of a plea agreement have been violated, the court must determine whether the government's conduct is consistent with the defendant's reasonable understanding of the agreement." *United States v. Valencia*, 985 F.2d 758, 761 (5th Cir. 1993). Any ambiguity in the agreement is construed against the Government. *See Farias*, 469 F.3d at 397. "The defendant bears the burden of demonstrating the underlying facts that establish the breach by a preponderance of the evidence." *United States v. Cantu*, 185 F.3d 298, 304-05 (5th Cir. 1999).

Doyle claims that he was immune from prosecution under the plea agreement because the RICO conspiracy charge constituted a drug trafficking crime.[46] Doyle argues that because he was acquitted of the counts other than the RICO conspiracy, and because the jury answered in the negative an interrogatory related to the RICO conspiracy charge asking whether Doyle "committed, or was a principal to, the February 20, 2011 murder of Littlejohn Haynes," the jury must have based his conviction for

---

[46] Doyle relies in part on an affidavit by his counsel in the prior case, which states that "it was his understanding that the 'crimes of violence' exemption in the plea agreement included only such statutory offenses that were not predicated upon" Doyle's drug trafficking activity and "he never would have advised Solomon Doyle to enter into the plea agreement and to plead guilty to drug activity that the government could later convert into a RICO case." However, "[a] defense counsel's subjective belief . . . does not, without more, immunize [a defendant] from prosecution." *United States v. McClure*, 854 F.3d 789, 796 (5th Cir. 2017). Instead, the question is whether Doyle and his counsel's understanding of the agreement was objectively reasonable. *Valencia*, 985 F.2d at 761.

No. 17-30610
c/w No. 17-30611

the RICO conspiracy on drug trafficking. We are not persuaded by this argument. As set out in more detail at the beginning of this opinion, to prove a RICO conspiracy "the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).[47] Even if the only evidence of Doyle's *participation* in the conspiracy that the jury credited was his drug dealing, the jury could have found that Doyle also *knew of* and *agreed to* the other aspects of the conspiracy. *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997) ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." (citation omitted)); *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) ("[The defendant] need only have known of and agreed to the overall objective of the RICO offense."). Because Doyle's knowledge of and agreement to non-drug related aspects of the conspiracy were at issue, it is not enough for him to point to his acquittal on the substantive count to argue that the RICO conspiracy charge must have been a drug trafficking

---

[47] The district court noted as much when it denied Doyle's renewed motion to dismiss:

> Doyle's argument that the conviction for RICO conspiracy violates the drug trafficking aspect of his plea agreement is based on the erroneous premise that the jury had to have found him guilty of some predicate act (even if uncharged) in order to convict him on Count 1. To the contrary, once the Government proves that two or more people agree to commit a substantive RICO offense, the Government need only prove that the defendant [Doyle] knew of and agreed to the overall objective of the RICO offense.

crime.[48] Accordingly, we hold that the agreement did not immunize Doyle from prosecution for the RICO conspiracy charge, and we decline to vacate his conviction.

### M. Speedy Trial Act Challenge

On appeal, Barnes makes claims under the Speedy Trial Act. Barnes was indicted on five charges on June 12, 2015. He made his initial appearance on June 23, 2015.[49] The trial date was initially set for August 24, 2015, but with the agreement of all parties, the court continued the trial to March 7, 2016.

On December 23, 2015, the Government filed a motion to suspend the December 31, 2015 discovery deadline that the district court had previously set, which the district court granted, and on December 30, 2015, the Government moved to continue the March 7, 2016 trial date. Barnes opposed the motion. However, the district court granted the continuance and set a new trial date of September 6, 2016. On March 17, 2016, Barnes filed a motion to dismiss the indictment under the Speedy Trial Act, which the district court denied.

On September 5, 2016, the Government turned over voluminous jailhouse calls to defense counsel, and all defense counsel subsequently moved for a continuance. The district court continued the trial to November

---

[48] Thus, acquittal on the substantive count does not necessarily preclude a conviction for RICO conspiracy. *See Salinas*, 522 U.S. at 62 (upholding conviction for RICO conspiracy despite acquittal on substantive RICO charge). In this case, although Doyle was acquitted of the Littlejohn Haynes murder, there was evidence presented at trial from which the jury could have inferred that Doyle knew of and agreed to the murder and/or the other non-drug trafficking aspects of the conspiracy.

[49] The last of Barnes' codefendants made their initial appearance on August 7, 2015.

28, 2016. Counsel for the other defendants moved again for a continuance to January 9, 2017, to which Barnes objected. The district court again granted the continuance. Barnes re-urged his motion to dismiss on speedy trial grounds both at the close of the Government's case-in-chief and after trial.

The Speedy Trial Act, 18 U.S.C. § 3161, requires that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." § 3161(c)(1). The Speedy Trial Act excludes from this time period:

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

§ 3161(h)(7)(A). However, "[n]o continuance under [§ 3161(h)(7)(A)] shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government." § 3161(h)(7)(C). When determining whether to grant an "ends of justice" continuance under § 3161(h)(7)(A), the district court must consider, among other factors,

> Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

§ 3161(h)(7)(B)(ii).

"We review the district court's factual findings supporting its Speedy Trial Act ruling for clear error and its legal conclusions *de novo*." *United States v. Stephens*, 489 F.3d 647, 652 (5th Cir. 2007). "A judge's finding that a continuance would best serve the ends of justice is a factual determination subject to review under the clearly erroneous standard." *United States v. Eakes*, 783 F.2d 499, 503 (5th Cir. 1986).

On appeal, Barnes argues that his rights to a speedy trial were violated when the district court granted the second six-month continuance, and that, in denying his motion to dismiss, the district court failed to take into account the Government's lack of diligence in tendering discovery to the defense. The district court denied Barnes's motion to dismiss based on a determination that given the size and scope of the indictment and the significant and ongoing motions practice, the relevant continuance served "the ends of justice," § 3161(h)(7)(A), "Barnes's assertions regarding dilatory tactics by the Government notwithstanding."

The district court did not clearly err in determining that the "ends of justice" would be served by continuing the March 7, 2016 trial date. The district court adequately "set[] forth . . . in writing, its reasons for finding that the ends of justice served by the granting of [the] continuance outweigh the best interests of the public and the defendant in a speedy trial," as required by § 3161(h)(7)(A). *United States v. Bieganowski*, 313 F.3d 264, 281-82 (5th Cir. 2002) ("The district court's February 12th order clearly satisfied the requirement of [section 1361(h)(7)] that the court articulate reasons recognized under the Act for granting a continuance . . . . The district court's order not only explicitly referenced [subsections of 1361], but also described the case as 'unusual and complex.'"). The district court discussed the complexity of the case, as required by § 3161(h)(7)(B)(ii), noting the number

of defendants and ongoing filing and consideration of numerous pretrial motions. *See United States v. Edelkind*, 525 F.3d 388, 397 (5th Cir. 2008) ("In prior cases, we have concluded that a district court's finding that a case is complex constitutes a sufficient ground to satisfy the statutory requirements for a continuance."). Though the district court did not conduct a detailed analysis of Barnes's claim that the Government's "lack of diligent preparation" was the reason for the continuance, the court's order reflects that the court considered that argument and rejected it. Moreover, the court made explicit findings in its order granting the Government's motion to continue that the case was complex and "that the ends of justice served by granting the requested continuance outweigh the best interest of the public and the defendant in a speedy trial," citing § 3161(h)(7)(A), (B)(i) & (B)(ii). *Cf. Bieganowski*, 313 F.3d at 282 (affirming denial of dismissal based on Speedy Trial Act where the district court noted the complexity of the case in the order on the motion to dismiss and the prior order granting a continuance).

Nor can we conclude that the Government's "lack of diligent preparation" was the cause for the continuance. The volume of discovery in this case suggests that even if the Government had met the initial December 31, 2015 deadline, there may have been insufficient time for the district court to address all the pretrial motions filed by all of the defendants before the March 7, 2016 trial date. Though the necessity of the continuance may have been caused in part by the Government's failure to tender discovery within the deadlines set by the district court, Barnes has not shown that that failure was due to a lack of diligence, rather than ongoing discovery litigation. Accordingly, the district court's determination that the continuance served "the ends of justice" was not clearly erroneous. *Eakes*, 783 F.2d at 503.

No. 17-30610
c/w No. 17-30611

## N. Sixth Amendment Challenge

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. In *Barker v. Wingo*, the Supreme Court established a four-factor balancing test for evaluating a claimed violation of the right to a speedy trial. 407 U.S. 514, 530 (1972). However, "[i]t will be the unusual case . . . where the time limits under the Speedy Trial Act have been satisfied but the right to a speedy trial under the Sixth Amendment has been violated." *Bieganowski*, 313 F.3d at 284. When "evaluating the district court's conclusion that there was no violation of [the defendant's] constitutional right to a speedy trial, we review findings of fact for clear error." *United States v. Molina-Solorio*, 577 F.3d 300, 303 (5th Cir. 2009). However, the district court's application of the *Barker* factors is reviewed *de novo*. *Id.* at 304.[50]

"A delay of less than one year will rarely qualify as 'presumptively prejudicial' for purposes of triggering the *Barker* inquiry." *Cowart v. Hargett*, 16 F.3d 642, 646 (5th Cir. 1994). And "any delay caused by [the defendant's] own requests for continuances should be discounted." *United States v. Jackson*, 549 F.3d 963, 970 (5th Cir. 2008). Barnes asserts that because the total time from indictment to trial exceeded one year, "[a] full-fledged *Barker* analysis is warranted." There were approximately nineteen months between Barnes's indictment (June 12, 2015) and the start of trial (January 9, 2017),

---

[50] The Government contends that Barnes failed to raise his Sixth Amendment claim in the district court and accordingly asks us to review only for plain error. *See United States v. Reagan*, 725 F.3d 471, 487 (5th Cir. 2013). Yet Barnes did raise his Sixth Amendment right to a speedy trial in his oppositions to the Government's continuance and his co-defendants' continuance, in which he also requested dismissal of the indictment in the event the continuance was granted. Ultimately, we need not decide the standard of review because we find that Barnes cannot prevail even under *de novo* review.

but approximately nine of those months were attributable to continuances in which Barnes joined.[51] The discounted length of the delay was only ten months, less than the one-year delay that triggers a full *Barker* analysis. *Cowart*, 16 F.3d at 646. Barker's Sixth Amendment right to a speedy trial has not been violated. *See Jackson*, 549 F.3d at 971; *United States v. Green*, 508 F.3d 195, 203 (5th Cir. 2007).

### O. Ineffective Assistance of Counsel Challenge

At the end of his brief, Ashton Price contends that it is "abundantly obvious from the record that trial counsel was ineffective," because "of the *hundreds* of pleadings filed by defense counsel and the government in this case . . . the Appellant's trial counsel filed seven motions, one of which was his motion to withdraw." Ashton Price does not otherwise identify specific examples of deficient performance or prejudice. We are not persuaded that this is one of the rare cases in which the record is sufficiently developed to allow for consideration of an ineffective assistance of trial counsel claim on direct appeal. *See United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014). Accordingly, we deny the claim without prejudice to Ashton Price's right to pursue it on collateral review. *Id.*

### P. Cumulative Errors Challenge

At the end of his brief, Owney argues that his convictions should be reversed, or a new trial ordered, because of the cumulation of errors in the case. Perry makes the same argument. We have emphasized that "[c]umulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness"; thus, "[t]he

---

[51] Barnes joined the motion to continue from August 24, 2015 to March 7, 2016 (six and a half months) and the motion to continue from September 6, 2016 to November 28, 2016 (two and a half months).

possibility of cumulative error is often acknowledged but practically never found persuasive." *United States v. Oti*, 872 F.3d 678, 690 n.10 (5th Cir. 2017) (internal quotation marks and citation omitted). We do not find the possibility persuasive here.

## III. Conclusion

For the reasons stated in this opinion, the judgment of the district court is AFFIRMED except with respect to the § 924 offenses based on RICO conspiracy as a crime of violence predicate. Accordingly, we VACATE Counts 3, 5, 7, 15, 16, 17, 19, 23, 25, 30, 34, 36, 38, 40, 42, and 46. In addition, we VACATE the sentence as it stands for Count 44. We REMAND for further proceedings consistent with this opinion.